**Deadline for Opposition Papers: June 23, 2022**

Alexander B. Lees
Daniel M. Perry
MILBANK LLP
55 Hudson Yards
New York, New York 10001
Telephone:  212-530-5161
*Attorneys for Defendants Banco Bilbao
Vizcaya Argentaria, S.A., et. al*\*

\**additional counsel listed in signature block*

## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AJ RUIZ CONSULTORIA EMPRESARIAL S.A., solely as Judicial Administrator and foreign representative of SCHAHIN HOLDING S/A, *et al.*,<br><br>                         Plaintiff,<br><br>             v.<br><br>BANCO BILBAO VIZCAYA ARGENTARIA, S.A, *et al.*,<br><br>                         Defendants. | Case No. 21-ap-01213-LGB |
| AJ RUIZ CONSULTORIA EMPRESARIAL S.A., solely as Judicial Administrator and foreign representative of SCHAHIN HOLDING S/A, et al.,<br><br>                         Plaintiff,<br><br>             v.<br><br>BANK OF CHINA, *et al.*,<br><br>                         Defendants. | Case No. 21-ap-01216-LGB |

## DEFENDANTS' CONSOLIDATED MOTIONS TO DISMISS

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................4

    A.    The parties..............................................................................................4

    B.    Defendants' valid secured loans and repayment out of their collateral...............................................................................................4

    C.    The Debtors' bankruptcy cases .............................................................6

    D.    These actions ........................................................................................6

ARGUMENT.............................................................................................................7

    I.    ALL CLAIMS ARE TIME-BARRED....................................................8

    A.    The limitations period for all claims is three years. .................................8

    B.    The limitations period expired before the original complaints were filed.....................................................................................................11

    II.    PLAINTIFF LACKS STANDING. ........................................................14

    A.    Plaintiff lacks Article III standing. ........................................................14

    B.    Plaintiff lacks prudential standing.........................................................18

    III.    PLAINTIFF'S CLAIMS FAIL ON THE MERITS..................................20

    A.    Plaintiff does not state a claim of unjust enrichment. ..............................20

    B.    Plaintiff does not state a claim for aiding and abetting breach of fiduciary duty. ....................................................................................25

    IV.    PLAINTIFF FAILS TO PLEAD PERSONAL JURISDICTION OVER MOST DEFENDANTS........................................................................29

    A.    Plaintiff does not allege sufficient contacts between the conduct underlying the claims and New York. ....................................................30

    B.    Defendants did not consent to jurisdiction in New York. ........................33

    V.    PLAINTIFF CANNOT OVERCOME THE PRESUMPTION OF IMMUNITY FOR THE IMMUNE DEFENDANTS. .........................................35

    A.    The FSIA's commercial activity exception to immunity does not apply. ................................................................................................36

    B.    Immune Defendants did not waive immunity.........................................38

CONCLUSION.......................................................................................................39

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Access Point Med., LLC v. Mandell*,
963 N.Y.S.2d 44 (App. Div. 2013) ...................................................................9

*Agerbrink v. Model Serv. LLC*,
155 F. Supp. 3d 448 (S.D.N.Y. 2016) ............................................................20

*Am. Lecithin Co. v. Rebmann*,
2017 WL 4402535 (S.D.N.Y. Sept. 30, 2017)................................................17

*Amigo Foods Corp. v. Marine Midland Bank-N.Y.*,
39 N.Y.2d 391 (1976).....................................................................................32

*Anderson v. Ind. Black Expo, Inc.*,
81 F. Supp. 2d 494 (S.D.N.Y. 2000) ..............................................................32

*Banco de Seguros del Estado v. Int'l Fin. Corp.*,
2007 WL 2746808 (S.D.N.Y. Sept. 20, 2007)................................................39

*Barnet v. Drawbridge Special Opportunities Fund LP*,
2014 WL 4393320 (S.D.N.Y. Sept. 5, 2014)..................................................19

*Barrett v. Tema Dev. (1988), Inc.*,
463 F. Supp. 2d 423 (S.D.N.Y. 2006) ............................................................30

*Bascuñan v. Elsaca*,
2021 WL 3540315 (S.D.N.Y. Aug. 11, 2021)......................................... 8, 9, 11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .........................................................................................8

*Berdeaux v. OneCoin Ltd.*,
561 F. Supp. 3d 379 (S.D.N.Y. 2021) ............................................................26

*Berkshire Cap. Grp., LLC v. Palmet Ventures, LLC*,
307 F. App'x 479 (2d Cir. 2008) ....................................................................32

*Bhutan Int'l Festival, Ltd. v. Eden Project*,
2018 WL 6329402 (S.D.N.Y. Dec. 3, 2018) ..................................................31

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
949 F. Supp. 2d 486 (S.D.N.Y. 2013) ............................................................21

*In re Bos. Generating, LLC,*
    440 B.R. 302 (Bankr. S.D.N.Y. 2010) ...................................................................27

*Buchwald v. The Renco Grp., Inc. (In re Magnesium Corp. of Am.),*
    399 B.R. 722 (Bankr. S.D.N.Y. 2009) ............................................................ 10, 20

*Bullmore v. Ernst & Young Cayman Is.,*
    861 N.Y.S.2d 578 (Sup. Ct. N.Y. Cnty. 2008) ..................................................20

*Capmark Fin. Grp., Inc. v. Goldman Sachs Credit Partners L.P.,*
    491 B.R. 335 (S.D.N.Y. 2013).............................................................................16

*Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood,*
    752 A.2d 1175 (Del. Ch. 1999).............................................................................16

*Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Gerber Life Ins. Co.,*
    771 F.3d 150 (2d Cir. 2014) ..................................................................................9

*Centauro Liquid Opps. Master Fund, L.P. v. Bazzoni,*
    2016 WL 5719793 (S.D.N.Y. Sept. 30, 2016)...........................................18 n.10

*Cohen v. BMW Invs. L.P.,*
    144 F. Supp. 3d 492 (S.D.N.Y. 2015) ................................................................25

*Daimler AG v. Bauman,*
    571 U.S. 117 (2014) ............................................................................................29

*Devengoechea v. Bolivarian Republic of Venez.,*
    889 F.3d 1213 (11th Cir. 2018).............................................................................37

*Eisenberg v. Permanent Mission of Eq. Guinea to U.N.,*
    832 F. App'x 38 (2d Cir. 2020) ..........................................................................36

*Epiphany Cmty. Nursery Sch. v. Levey,*
    94 N.Y.S.3d 1 (App. Div. 2019) ........................................................................28

*Faulkner v. Kornman (In re Heritage Org. L.L.C.),*
    413 B.R. 438 (Bankr. N.D. Tex. 2009) .......................................................17, 18

*Fezzani v. Bear, Stearns & Co.,*
    2004 WL 1781148 (S.D.N.Y. Aug. 10, 2004)......................................................8

*Galgay v. Bulletin Co.,*
    504 F.2d 1062 (2d Cir. 1974)...............................................................................32

*Ga. Malone & Co. v. Rieder,*
    19 N.Y.3d 511 (N.Y. 2012) ................................................................................24

*Glob. Fin. Corp. v. Triarc Corp.*,
    93 N.Y.2d 525 (1999) ....................................................................................... 13

*Goodman v. H.I.G. Cap., LLC (In re Gulf Fleet Holdings, Inc.)*,
    491 B.R. 747 (Bankr. W.D. La. 2013) ............................................................... 17

*Granfinanciera, S.A. v. Nordberg*,
    492 U.S. 33 (1989) ............................................................................................ 10

*Grynberg v. Eni S.p.A.*,
    2007 WL 2584727 (S.D.N.Y. Sept. 5, 2007) ..................................................... 10

*Hart v. Bank of Am. Home Loans (In re Hart)*,
    2015 WL 3895476 (B.A.P. 9th Cir. June 24, 2015) ........................................... 14

*Helicopteros Nacionales de Colom., S.A. v. Hall*,
    466 U.S. 408 (1984) ................................................................................... 33 n.12

*Hirsch v. Arthur Andersen & Co.*,
    72 F.3d 1085 (2d Cir. 1995) ......................................................................... 8, 14

*Holliday v. K Rd. Power Mgmt., LLC (In re Bos. Generating LLC)*,
    617 B.R. 442 (Bankr. S.D.N.Y. 2020) ......................................................... 10, 20

*Hosking v. TPG Cap. Mgmt., L.P. (In re Hellas Telecomms. (Lux.) II SCA)*,
    524 B.R. 488 (Bankr. S.D.N.Y. 2015) ............................................................... 19

*IBM Corp. v. Liberty Mut. Ins. Co.*,
    363 F.3d 137 (2d Cir. 2004) ......................................................................... 8 n.6

*ICP Strategic Credit Income Fund, Ltd. v. DLA Piper L.L.P. (US) (In re ICP
    Strategic Income Fund, Ltd.)*,
    730 F. App'x 78 (2d Cir. 2018) ......................................................................... 18

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*,
    12 N.Y.3d 132 (2009) ....................................................................................... 25

*Inspired Cap., LLC v. Conde Nast*,
    2018 WL 6173712 (S.D.N.Y. Nov. 26, 2018) ................................................... 11

*Irwin & Leighton, Inc. v. W.M. Anderson Co.*,
    532 A.2d 983 (Del. Ch. 1987) ........................................................................... 16

*Jam v. Int'l Fin. Corp.*,
    139 S. Ct. 759 (2019) ......................................................................... 36, 37, 38 n.15

*Jam v. Int'l Fin. Corp.*,
    3 F.4th 405 (D.C. Cir. 2021) ............................................................................. 37

*Kalb, Voorhis & Co. v. Am. Fin. Corp.*,
  8 F.3d 130 ........................................................................................................16

*Kirschner v. CIHLP LLC*,
  2017 WL 4402545 (S.D.N.Y. Sept. 30, 2017)...................................................17

*Kling v. World Health Org.*,
  532 F. Supp. 3d 141 (S.D.N.Y. 2021) ...............................................................35

*Lia v. Saporito*,
  541 F. App'x 71 (2d Cir. 2013) ...........................................................................9

*Liberian Cmty. Ass'n of Conn. v. Lamont*,
  970 F.3d 174 (2d Cir. 2020) ................................................................................8

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  2015 WL 6243526 (S.D.N.Y. 2015) ..................................................................29

*Luxexpress 2016 Corp. v. Gov't of Ukr.*,
  2018 WL 1626143 (S.D.N.Y. Mar. 30, 2018) ...................................................35

*Magi XXI, Inc. v. Stato Della Città Del Vaticano*,
  714 F.3d 714 (2d Cir. 2013) ..............................................................................35

*Magi XXI, Inc. v. Stato Della Città Del Vaticano*,
  818 F. Supp. 2d 597 (E.D.N.Y. 2011).................................................................34

*Maranga v. Vira*,
  386 F. Supp. 2d 299 (S.D.N.Y. 2005) ................................................................31

*Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.*,
  264 F.3d 32 (2d Cir. 2001) ................................................................................30

*Martin Hilti Fam. Tr. v. Knoedler Gallery, LLC*,
  137 F. Supp. 3d 430 (S.D.N.Y. 2015) ...............................................................11

*McChristian v. Ditech Holding Corp. (In re Ditech Holding Corp.)*,
  2021 WL 5225840 (Bankr. S.D.N.Y. Nov. 9, 2021) .....................................6 n.5

*Mendelsohn v. Kovalchuk (In re APCO Merch. Servs., Inc.)*,
  585 B.R. 306 (Bankr. E.D.N.Y. 2018) ...............................................................22

*Mobil Oil Corp. v. Linear Films, Inc.*,
  718 F. Supp. 260 (D. Del. 1989).........................................................................16

*Mueller v. Michael Janssen Gallery Pte. Ltd.*,
  225 F. Supp. 3d 201 (S.D.N.Y. 2016) ................................................................25

*Nguyen v. FXCM Inc.*,
    364 F. Supp. 3d 227 (S.D.N.Y. 2019) ................................................................26

*Nutmeg Ins. Co. v. Iowa Mut. Ins. Co.*,
    2005 WL 1529523 (S.D.N.Y. June 29, 2005) ....................................................32

*OBB Personenverkehr AG v. Sachs*,
    577 U.S. 27 (2015) ........................................................................................36, 37

*Pablo Star Ltd. v. Welsh Gov't*,
    961 F.3d 555 (2d Cir. 2020) ...............................................................................36

*Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*,
    721 F.3d 54 (2d Cir. 2013) .................................................................................18

*Pincione v. D'Alfonso*,
    506 F. App'x 22 (2d Cir. 2012) ..........................................................................31

*Ramiro Aviles v. S&P Glob., Inc.*,
    380 F. Supp. 3d 221 (S.D.N.Y. 2019) ................................................................34

*Rogers v. Petroleo Brasileiro, S.A.*,
    673 F.3d 131 (2d Cir. 2012) ...............................................................................36

*S & S Mach. Co. v. Masinexportimport*,
    706 F.2d 411 (2d Cir. 1983) ...............................................................................36

*Saudi Arabia v. Nelson*,
    507 U.S. 349 (1993) .............................................................................35, 38 n.15

*In re Schahin Holdings S.A., et al.*,
    Case No. 19-bk-19932-RAM (Bankr. S.D. Fla.) ........................................4, 6, 19

*Serengeti Express, LLC v. JP Morgan Chase Bank, N.A.*,
    2020 WL 2216661 (S.D.N.Y. May 7, 2020) ...................................................8 n.6

*Shapiro v. Republic of Bol.*,
    930 F.2d 1013 (2d Cir. 1991)..............................................................................39

*Sharp Int'l Corp. v. State St. Bank & Tr. Co. (In re Sharp Int'l Corp.)*,
    403 F.3d 43 (2d Cir. 2005) ..........................................................................*passim*

*Shearson Lehman Hutton, Inc. v. Wagoner*,
    944 F.2d 114 (2d Cir. 1991) ...............................................................3, 18, 19, 20

*Sigmon v. Goldman Sachs Mortg. Co.*,
    2016 WL 3982509 (S.D.N.Y. July 22, 2016) ..................................................5 n.4

*Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*,
　　549 U.S. 422 (2007) ...........................................................................35

*Tehran-Berkeley Civil & Envtl. Engineers v. Tippetts-Abbet-McCarthy-Stratton*,
　　888 F.2d 239 (2d Cir. 1989) ............................................................ 8 n.6

*The Mediators, Inc. v. Manney (In re The Mediators, Inc.)*,
　　105 F.3d 822 (2d Cir. 1997) ...............................................................20

*Thomas v. Ashcroft*,
　　470 F.3d 491 (2d Cir. 2006) .................................................................8

*Tianbo Huang v. iTV Media, Inc.*,
　　13 F. Supp. 3d 246 (E.D.N.Y. Apr. 8, 2014) ................................. 18 n.10

*Trevino v. Merscorp, Inc.*,
　　583 F. Supp. 2d 521 (D. Del. 2008) ....................................................16

*Tronox Inc. v. Kerr-McGee Oil & Gas Corp. (In re Tronox, Inc.)*,
　　855 F.3d 84 (2d Cir. 2017) .................................................................17

*Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*,
　　599 N.Y.S.2d 816 (App. Div. 1993) ........................................ 21, 22, 24

*United States v. Goforth*,
　　465 F.3d 730 (6th Cir. 2006) ..............................................................21

*UPS Store, Inc. v. Hagan*,
　　99 F. Supp. 3d 426 (S.D.N.Y. 2015) ...................................................25

*Vasquez v. H.K. & Shanghai Banking Corp.*,
　　2019 WL 2327810 (S.D.N.Y. May 29, 2019) .................................. 33 n.12

*Vasquez v. H.K. & Shanghai Banking Corp.*,
　　477 F. Supp. 3d 241 (S.D.N.Y. 2020) ............................................ 32, 33

*Vuzix Corp. v. Pearson*,
　　2019 WL 5865342 (S.D.N.Y. Nov. 6, 2019) .........................................34

*World Wide Minerals, Ltd. v. Republic of Kaz.*,
　　296 F.3d 1154 (D.C. Cir. 2002) ..........................................................39

**Statutes**

11 U.S.C. Chapter 15 ..................................................................*passim*

28 U.S.C. § 1603..........................................................................36, 37

Brazilian Bankruptcy Law art. 129 ...............................................13 n.9

Brazilian Civil Code art. 1145 ................................................................................. 13

Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1605 ......................... 35, 36, 37 n.14, 39

International Organizations Immunities Act of 1945, 22 U.S.C. § 288a(b) ......................... 35, 39

**Other Authorities**

Articles of Agreement of the International Finance Corporation, art. I ............................. 38 n.15

Fed. R. Bankr. P. 7012 .................................................................................... 1, 7

Fed. R. Civ. P. 12(b) ............................................................................... 1, 6 n.5, 7, 8

Fed. R. Evid. 201 .............................................................................................. 5

N.Y. C.P.L.R. § 202 ......................................................................................... 13

N.Y. C.P.L.R. § 302 ..................................................................................... 30, 32

U.S. Const. amend. VII .................................................................................... 11

Defendants hereby move to dismiss the amended complaints in accordance with Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6), as made applicable to these actions by Federal Rule of Bankruptcy Procedure 7012.

## PRELIMINARY STATEMENT

These adversary proceedings seek an extraordinary outcome that flies in the face of fairness and well established legal principles: Plaintiff asks the Court to order Defendants—secured creditors of entities that are not debtors in any bankruptcy case anywhere—to return payments they received more than seven years ago on their valid loans, out of the proceeds of their own collateral, so that Plaintiff can use the proceeds to satisfy *unsecured* creditors of completely *different* entities that are debtors in a bankruptcy case in Brazil. Such an unusual result would upset basic notions of corporate separateness and priorities among creditors, not to mention settled expectations about loan repayments that closed nearly a decade ago. The claims asserted here have no basis.

The underpinnings of these actions are straightforward. Beginning in 2007, Defendants made valid secured loans to a special-purpose vehicle, Black Gold Drilling LLC ("Black Gold") (together with its wholly owned subsidiaries, Baerfield Drilling LLC ("Baerfield"), and Soratu Drilling LLC ("Soratu"), the "Borrowers"), to finance the construction of two semi-submersible oil-drilling rigs, with the rigs and other assets of the Borrowers serving as collateral. In 2014, the Borrowers refinanced the collateral in a routine sale-leaseback transaction: they sold the rigs to a third-party bank, leased them back, and used the sale proceeds to repay the Defendants.

Plaintiff now challenges the Defendants' receipt of the repayments and seeks damages on claims of unjust enrichment and aiding and abetting breach of fiduciary duty. Plaintiff asserts that it was unfair for Defendants to get paid while "other creditors" were left unsatisfied. Am.

- 1 -

Compl. ¶ 5.[1] But Plaintiff does not act for or represent the interests of "other creditors" of the Borrowers. Rather, Plaintiff is the judicial administrator of completely different and separate entities (the "Debtors") that are in bankruptcy in Brazil and subject to a corresponding chapter 15 case in Florida, and it purports to be suing for the benefit of those entities' unsecured creditors. *Id.* ¶ 1. The Borrowers have distinct corporate forms from the Debtors, are not debtors in either bankruptcy proceeding, and neither they nor their assets are part of the Debtors' bankruptcy estates. Plaintiff therefore is allegedly suing on behalf of unsecured creditors who never had a right to the collateral securing Defendants' loans, or the proceeds of those assets.

For a variety of reasons, the amended complaints must be dismissed:

*First*, the actions are time-barred because New York's limitations period for all claims asserted in the amended complaints is three years where, as here, the claims seek money damages. That period began to run at the time of the sale-leaseback transaction in 2014, when Defendants were repaid on their loans, and therefore expired in 2017. Plaintiff did not initiate these actions until 2021. *Infra* Part I.

*Second*, Plaintiff lacks Article III standing because it claims to sue on behalf of the Debtors, and for the benefit of their unsecured creditors, none of which had any right to the Borrowers' assets, let alone to property pledged as collateral for the Borrowers' loans. The constituency Plaintiff claims to represent therefore suffered no injury in fact when those assets were used to repay the Borrowers' secured lenders. Alternatively, Plaintiff lacks prudential

---

[1] References to "Am. Compl." are to the amended complaint in Case No. 21-ap-01213 (Dkt. No. 1-102). The amended complaint in Case No. 21-ap-01216 is substantively identical (Dkt. No. 1-64). For the sake of simplicity, Defendants will refer only to the amended complaint in the 21-ap-01213 action throughout this brief, unless the argument is unique to the amended complaint in Case No. 21-ap-01216. In those circumstances, the docket is specified.

standing under the *Wagoner* rule because it alleges that the Debtors participated in the

challenged conduct. *Infra* Part II.

      **Third**, both theories of liability advanced by Plaintiff fail on the merits. It is black-letter

law that repayment of a valid debt is not unjust enrichment or otherwise wrongful, even if the

effect is to leave the debtor unable to repay other creditors. Likewise, the Second Circuit has held

that receipt of funds in satisfaction of a valid debt does not constitute "inducement" or

"substantial participation" necessary to state a claim for aiding and abetting breach of fiduciary

duty. Plaintiff also cannot plead facts supporting other essential elements of its claims, including

that Defendants had actual knowledge of the alleged breaches, or that the Debtors or their

unsecured creditors were damaged by the disposition of separate entities' assets. *Infra* Part III.

      **Fourth**, 19 of the 23 Defendants are not subject to personal jurisdiction in this Court.

These Defendants are international financial institutions with principal places of business outside

New York. Plaintiff does not allege a sufficient connection between the forum and the conduct

underlying its claims. To the contrary, Plaintiff pleads facts that are overwhelmingly foreign. Nor

can Plaintiff rely on the forum-selection clauses in the documents governing the loans from the

Defendants to the Borrowers because neither the Debtors nor their creditors were parties to those

agreements. *Infra* Part IV.

      **Fifth**, some Defendants are sovereign entities or international organizations that are

immune from this lawsuit. Plaintiff has failed to plead facts to overcome this bar. Its reliance on

the forum-selection clauses to argue a waiver of immunity fails for the reason that those clauses

do not confer personal jurisdiction. And Plaintiff's suit against the immune Defendants, based on

alleged conduct of non-parties with an insufficient nexus to the United States, does not meet the

requirements of the commercial-activity exception to immunity. *Infra* Part V.

## BACKGROUND

The following facts are drawn from the allegations in the amended complaints and recited here solely to give context for these motions. Defendants reserve the right to contest Plaintiff's allegations for all purposes in these actions.

### A.    The parties

Plaintiff is the judicial administrator and foreign representative of a set of affiliated companies in the oil-and-gas business—namely, the Debtors—which are subject to a bankruptcy case in Brazil and an associated chapter 15 case in Florida (*In re Schahin Holdings S.A., et al.*, Case No. 19-bk-19932-RAM (Bankr. S.D. Fla.)). The Debtors allegedly are part of a larger set of 40 companies that Plaintiff labels the "Schahin Group," apparently on the basis that these distinct entities are ultimately owned by the same two individuals. Am. Compl. ¶¶ 30–34.

Defendants are 23 international financial institutions located in jurisdictions across the world, including China, Japan, South Korea, the United Kingdom, Italy, France, Spain, Germany, Grand Cayman, Brazil, and the United States. Am. Compl. ¶¶ 13–29; Case No. 21-ap-01216 Am. Compl. ¶ 19.

### B.    Defendants' valid secured loans and repayment out of their collateral

Between 2007 and 2009, Defendants lent over $800 million to the Borrowers—which are not Debtors in any bankruptcy case nor parties to these actions—under a Credit Agreement and an Amended and Restated Credit Agreement (collectively, the "Credit Agreements").[2] Am. Compl. ¶¶ 44–49, 53. The Borrowers were "special purpose vehicle[s]" set up as Delaware limited liability companies to hold the semi-submersible oil rigs named the *Amazonia* and the

---

[2] Unlike the rest of the Defendants, Deutsche Bank Trust Company Americas ("DBTCA") was not a lender, but instead served as the collateral agent under the relevant agreements (*see* Am. Compl. ¶¶ 47, 51, 55, 57, 77), and is swept up in the allegations against the lenders. Many of Plaintiff's allegations improperly conflate all Defendants together, failing to distinguish DBTCA's different role.

*Pantanal*, which were constructed using the funds lent by Defendants. *Id.* ¶¶ 37–39, 44. The rigs
and other assets of the Borrowers served as collateral for the Borrowers' obligations under the
Credit Agreements. *Id.* ¶¶ 48, 52, 56, 58; Perry Decl.[3] Ex. A, Amended and Restated Credit
Agreement at 11, 20, 33, 42 (defining "Collateral" to include "Mortgaged Property," which
encompasses "the BDL Drilling Unit" and "the SDL Drilling Unit"—the *Amazonia* and
*Pantanal*, respectively).[4]

On September 12, 2014, the Borrowers closed a refinancing of the rigs through a
transaction with a subsidiary of Industrial and Commercial Bank of China ("ICBC"), a foreign
bank that is not a Defendant in these actions, whereby the Borrowers sold the rigs and leased
them back from ICBC, the buyer. Am. Compl. ¶¶ 74–76. The Borrowers and Defendants entered
into an Assignment Agreement, under which the lenders assigned the Borrowers' secured debt to
the Borrowers' parent, Sea Biscuit International Inc. ("Sea Biscuit")—also not a party to these
actions, nor one of the Debtors—and Sea Biscuit agreed to pay the outstanding principal on the
assigned loans, while the Borrowers agreed to pay the unpaid interest. *Id.* ¶ 75. As is customary
in any secured lending arrangement, the proceeds of the sale of the rigs were used to repay the
loans that the rigs secured. *Id.* ¶¶ 80–86. The Borrowers also used $188 million of the proceeds
from the sale of the rigs to fund a settlement in a lawsuit in which they were defendants. Case
No. 21-ap-01216 Am. Compl. ¶ 67.

---

[3] "Perry Decl." refers to the Declaration of Daniel M. Perry in Support of Defendants' Consolidated Motions to
Dismiss, filed contemporaneously herewith.

[4] "When deciding a motion to dismiss, the Court is entitled to consider, among other things, facts alleged in the
complaint, documents attached to the pleadings or incorporated by reference, documents that are 'integral' to the
plaintiff's claims, documents or information contained in the defendants' motion papers, and facts of which judicial
notice may be properly taken under Rule 201 of the Federal Rules of Evidence." *Sigmon v. Goldman Sachs Mortg.
Co.*, 2016 WL 3982509, at *4 (S.D.N.Y. July 22, 2016) (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42,
47-48 (2d Cir. 1991)). This permits the Court to consider the Credit Agreements and the Assignment Agreement in
deciding this motion.

C.      **The Debtors' bankruptcy cases**

The Debtors filed for reorganization in Brazil on April 17, 2015. Am. Compl. ¶ 94. In 2018, the Brazil court converted the Debtors' reorganization into a bankruptcy. *Id.* ¶ 98. In 2019, the United States Bankruptcy Court for the Southern District of Florida granted recognition of the Brazil case as a foreign main proceeding under chapter 15 of the Bankruptcy Code. *Id.* ¶ 102.

The Borrowers are separate and distinct entities from the Debtors. *See In re Schahin Holdings S.A.*, Case No. 1:19-bk-19932 Dkt. No. 19 (listing the Debtors).[5] They are not even direct or indirect subsidiaries or shareholders of any of the Debtors. The Borrowers' assets therefore are not part of the bankruptcy cases in Brazil and Florida and so are not available to the creditors in those cases. Plaintiff does not represent the Borrowers or their creditors.

D.      **These actions**

On July 15, 2021, nearly seven years after the repayment of Defendants' secured loans and two years after the commencement of the chapter 15 case, Plaintiff filed these actions in the district court. Both actions allege the same facts; the only difference between the cases is that some of the Defendants in the 1216 action have immunity defenses, as set forth below. As required by Judge Castel's individual practices, the parties exchanged a series of pre-motion letters laying out their positions in advance of any motion-to-dismiss briefing. Judge Castel authorized Plaintiff to file amended complaints, which it did on November 17, 2021, with a full understanding of the arguments Defendants intended to make in seeking dismissal.

In the amended complaints, Plaintiff asserts two causes of action seeking damages in the amount Defendants received in satisfaction of their secured loans. The first is for unjust

---

[5] "It is well settled that in resolving a Rule 12(b)(6) motion, the court 'may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue.'" *McChristian v. Ditech Holding Corp. (In re Ditech Holding Corp.)*, 2021 WL 5225840, at *2 n.10 (Bankr. S.D.N.Y. Nov. 9, 2021) (quoting *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979)).

enrichment. Plaintiff alleges that it was improper for Defendants to receive repayment on their secured loans to the Borrowers (or, in the case of DBTCA, the fees it received under the Credit Agreements) because the unsecured creditors of the separate Debtor entities did not receive notice or give their consent to the Borrowers' sale of the rigs to ICBC, as was supposedly required under Brazil law. Am. Compl. ¶¶ 109–112, 115–124.

The second cause of action asserts aiding and abetting breach of fiduciary duty. Plaintiff alleges that Eonio Rocha and Gustavo Shinohara negotiated on behalf of the Borrowers to sell the *Amazonia* and *Pantanal* for less than the rigs' appraised value while secretly plotting to start their own company, Bambu Servicos de Petroleo e Gas Ltda, which would contract with ICBC to operate the rigs after the sale. *Id.* ¶¶ 70, 73, 88. Plaintiff claims that this conduct amounted to breaches by Rocha and Shinohara (who are not parties here) of the duties of care and loyalty that they owed to "the Schahin Group," and that Defendants aided and abetted these breaches by receiving repayment of their loans or payment of fees under the Credit Agreements. *Id.* ¶¶ 127–130. Plaintiff alleges that Defendants learned of the alleged breaches nine months after they were committed. *Id.* ¶ 97.

On December 6, 2021, after the Defendants submitted another round of pre-motion letters, but before any conference occurred in the district court, both actions were referred to this Court as related to the chapter 15 case in the Southern District of Florida. *See* Case No. 21-ap-01213 Dkt. Nos. 1-104, 1-105, 1-106; Case No. 21-ap-01216 Dkt. Nos. 1-72, 1-73, 1-74. Plaintiff demands a jury trial on all claims in both actions. Am. Compl. ¶¶ 125, 133.

## ARGUMENT

Federal Rule of Civil Procedure 12(b) applies to these adversary proceedings through Federal Rule of Bankruptcy Procedure 7012(b). Rule 12(b) requires dismissal of an action where the court lacks subject-matter jurisdiction because the plaintiff does not have standing or the

defendant is immune from the suit (Rule 12(b)(1)), where the court lacks personal jurisdiction

over a defendant (Rule 12(b)(2)), or where the complaint fails to state a claim (Rule 12(b)(6)).

The plaintiff has the burden of alleging facts "affirmatively and plausibly" suggesting that it has

standing to sue (*Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 184 (2d Cir. 2020)

(citation omitted)), "mak[ing] a prima facie showing that jurisdiction exists" (*Thomas v.

Ashcroft*, 470 F.3d 491, 495 (2d Cir. 2006)), and pleading "enough facts to state a claim to relief

that is plausible on its face" (*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While the

Court must accept facts that are well pleaded and draw reasonable inferences from them in

Plaintiff's favor, it need not accept conclusory allegations or legal assertions. *E.g.*, *Hirsch v.

Arthur Andersen & Co.*, 72 F.3d 1085, 1092–93 (2d Cir. 1995).

## I.    ALL CLAIMS ARE TIME-BARRED.

The amended complaints challenge loan repayments that occurred in 2014. They are

untimely and therefore must be dismissed as a matter of law.

### A.    The limitations period for all claims is three years.

Under New York law,[6] the statute of limitations for both unjust enrichment and aiding

and abetting breach of fiduciary duty claims is either three years or six years, depending on the

substance of the relief sought. If the relief sought is monetary, the limitations period is three

years; if equitable, the limitations period is six years. *E.g.*, *Bascuñan v. Elsaca*, 2021 WL

3540315, at *6 (S.D.N.Y. Aug. 11, 2021) (unjust enrichment); *Fezzani v. Bear, Stearns & Co.*,

---

[6] Plaintiff does not plead application of another jurisdiction's law in the amended complaints, nor did it contest application of New York law in the voluminous pre-motion correspondence that occurred in the district court before these cases were referred. In the absence of an identified conflict, the Court applies the law of the forum. *E.g.*, *IBM Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004); *Tehran-Berkeley Civ. & Env't. Eng'rs v. Tippetts-Abbet-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989); *Serengeti Express, LLC v. JP Morgan Chase Bank, N.A.*, 2020 WL 2216661, at *2 (S.D.N.Y. May 7, 2020).

2004 WL 1781148, at *2-3 (S.D.N.Y. Aug. 10, 2004) (citing *Loengard v. Santa Fe Indus., Inc.*,

70 N.Y.2d 262, 266 (1987)) (aiding and abetting breach of fiduciary duty).

    In evaluating what form of relief is sought, courts look beyond the face of the complaint

to the substance: they reject attempts by plaintiffs to extend the limitations period by styling their

prayer for relief as one for an equitable remedy like "disgorgement" or "restitution" when the

complaint just seeks money, such as the return of a specific sum that allegedly was wrongfully

paid to the defendant. *See, e.g.*, *Bascuñan*, 2021 WL 3540315, at *7 (rejecting plaintiff's

characterization of complaint as seeking equitable relief in an attempt to extend the statute of

limitations for unjust enrichment); *see also Lia v. Saporito*, 541 F. App'x 71, 75 (2d Cir. 2013)

("The calculated use of the term 'disgorgement' instead of other equally applicable terms such as

repayment, recoupment, refund, or reimbursement, should not be permitted to distort the nature

of [the] claim so as to expand the applicable limitations period from three years to six." (citation

omitted)); *Access Point Med., LLC v. Mandell*, 963 N.Y.S.2d 44, 47 (App. Div. 2013)

("[P]laintiffs' demand for the return of attorneys' fees they paid to defendants is, essentially, a

claim for monetary damages. . . . We cannot allow a purely semantic distinction to control the

application of the statute of limitations.").

    As the Second Circuit has held, the "key factor" in determining how to characterize a

prayer for relief is the source of the funds from which the plaintiff seeks compensation: if the

claimant is trying to recover money "that could be traced to a particular fund held by a

defendant," the claim may be interpreted as equitable; but when "a claimant [is] seeking

restitution from a defendant's general funds, . . . the claim [is] legal." *Cent. States, Se. & Sw.

Areas Health & Welfare Fund v. Gerber Life Ins. Co.*, 771 F.3d 150, 155 (2d Cir. 2014).

Here, Plaintiff purports to seek "restitution" (Am. Compl. p. 30), but the substance of the amended complaints is a request for a money judgment. *See* Am. Compl. ¶ 1 ("Plaintiff brings claims for unjust enrichment and aiding and abetting breach of fiduciary duty on behalf of thousands of creditors of the Schahin Group . . . to recover more than $[800] million that Defendants unlawfully obtained at those creditors' expense."). Plaintiff does not allege that any Defendant is holding the money it received more than seven years ago in a separate fund and did not add that money to its general accounts. Nor could it, as such an allegation (especially with respect to dozens of international financial institutions) would be facially implausible.

In other words, this is an action about fungible dollars and cents, not a segregated piece of property that could be the subject of an equitable remedy. *See, e.g.*, *Grynberg v. Eni S.p.A.*, 2007 WL 2584727, at *3 (S.D.N.Y. Sept. 5, 2007) (applying three-year period for unjust enrichment claim where complaint sought "restitution for monetary damages"); *Holliday v. K Rd. Power Mgmt., LLC (In re Bos. Generating LLC)*, 617 B.R. 442, 469 (Bankr. S.D.N.Y. 2020) (three-year statute of limitations applied to unjust enrichment claim brought by bankruptcy trustee for monetary relief). In any event, since all Plaintiff wants is for Defendants to pay money into the Debtors' estates so that the funds can be used to pay the Debtors' unsecured creditors, Plaintiff has an adequate remedy at law if it is successful: a money judgment. That, too, means its claims cannot be subject to a six-year limitations period. *Buchwald v. The Renco Grp., Inc. (In re Magnesium Corp. of Am.)*, 399 B.R. 722, 747-48 (Bankr. S.D.N.Y. 2009) (declining to apply six-year period "when full relief can be granted at law").

Finally, if there were any remaining doubt about the nature of Plaintiff's prayer for relief, the amended complaints demand a jury trial. That is a clear signal that Plaintiff itself believes its lawsuits are legal rather than equitable. *See, e.g.*, *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33,

42 (1989) (Seventh Amendment applies only to "suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered" (citation omitted)).[7]

**B.    The limitations period expired before the original complaints were filed.**

New York law provides that the limitations period for an unjust enrichment claim "begins to run upon the occurrence of the wrongful act giving rise to the duty of restitution." *Martin Hilti Fam. Tr. v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 430, 466 (S.D.N.Y. 2015) (quoting *Ingrami v. Rovner*, 847 N.Y.S.2d 132, 134 (App. Div. 2007)); *Bascuñan*, 2021 WL 3540315, at *7 (same). Similarly, a claim premised on a breach of fiduciary duty "accrues when 'the fiduciary openly repudiates his or her obligation.'" *Inspired Cap., LLC v. Conde Nast*, 2018 WL 6173712, at *6 (S.D.N.Y. Nov. 26, 2018) (quoting *Lebedev v. Blavatnik*, 38 N.Y.S.3d 159, 162 (App. Div. 2016)). Thus, the limitations period governing Plaintiff's claims began to run in September 2014 when the allegedly wrongful acts at issue in the amended complaints were completed—that is, when the *Amazonia* and *Pantanal* were sold to ICBC and the Defendants were repaid on their secured loans. Am. Compl. ¶¶ 69, 74. These actions were not brought until July 2021, nearly seven years later. So regardless of whether a three-year or a six-year period applies, the claims are untimely.

In an unsuccessful effort to plead around the timeliness defect, Plaintiff alleges that the conduct of which it complains did not "harm[] other creditors" until March 2018 when the Debtors' reorganization in Brazil was converted to a bankruptcy case as a result of the Debtors' failure to make payments under its reorganization plan, and it was only at that point that "the

---

[7] While Defendants maintain that the relief sought in the Amended Complaints is legal in nature, they do not concede that the jury demand is otherwise proper and reserve all rights and objections on that issue.

breach of establishment rules became actionable under Brazilian law." Am. Compl. ¶¶ 98, 113. This position is rife with problems and cannot overcome the time bar.

For one thing, Plaintiff's theory is irrelevant because a three-year time limit applies, as discussed above. Even if the claims accrued in March 2018, they expired by March 2021, several months before the original complaints were filed in July 2021.

Furthermore, Plaintiff's position makes no sense. It cannot be that the repayment of Defendants' valid loans was not unjust or tortious when it occurred but somehow, at some later time, transformed into an injustice or a tort based on the commencement of a bankruptcy case over which Defendants had no control. While Plaintiff contends that it was not until March 2018 that the Debtors failed to meet their obligations to pay their unsecured creditors under their reorganization plan, its theory is that the Debtors' inability to pay was caused by an alleged depletion of the Debtors' assets that occurred in 2014. The alleged injury to the creditors is derivative of the alleged injury to the Debtors' estates, and that injury occurred (if at all) when the rigs were sold and the proceeds were used to pay Defendants.

Plaintiff's reliance on Brazil law to support its timeliness argument is unavailing. Plaintiff has not asserted a cause of action for violation of Brazil's statutory provisions regarding establishment sales, but rather has asserted causes of action under New York's common law of unjust enrichment and aiding and abetting. And New York law holds that these claims accrued when the allegedly unjust payments occurred in 2014. That should end the analysis.

What is more, Plaintiff misstates Brazil law when it asserts that "the breach of establishment rules became actionable," and creditors first had an "interest in seeking judicial relief," only once the Debtors' case was converted to a bankruptcy in 2018. Am. Compl. ¶ 113. To the contrary, as explained in the declaration of Gabriel Seijo Leal de Figueiredo, a seasoned

practitioner with extensive experience litigating commercial law and insolvency matters in Brazil, art. 1,145 of the Brazilian Civil Code permits creditors to challenge the sale of their debtor's establishment as soon as the sale occurs, even if the debtor is not in bankruptcy. This reflects the general principle of Brazil law that a claim accrues at the moment the plaintiff's rights are violated. Seijo Decl.[8] ¶ 19. Brazil law therefore did not require the creditors, if they had a cause of action at all, to wait to bring suit until the Debtors' reorganization was converted to a bankruptcy in March 2018. Seijo Decl. ¶¶ 18-23.[9]

Finally, even if Brazil law did apply, and even if that law did establish a later date for accrual, this would not matter. Under New York's borrowing statute, if the claims accrued in Brazil such that Brazil law governed, they would have to be timely under both New York and Brazil law to be maintained by a non-resident like Plaintiff. *See* N.Y. C.P.L.R. § 202; *Glob. Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 528 (1999) ("When a nonresident sues on a cause of action accruing outside New York, CPLR 202 requires the cause of action to be timely under the limitation periods of both New York and the jurisdiction where the cause of action accrued."). Plaintiff's failure to bring claims within New York's limitations period is fatal, regardless of when Plaintiff thinks its allegations "became actionable" in Brazil.

---

[8] "Seijo Decl." or "Seijo Declaration" refers to the Declaration of Gabriel Seijo Leal de Figueiredo, filed contemporaneously herewith.

[9] Plaintiff's reference to a claim "becoming actionable" in Brazil once a bankruptcy case is pending appears to be a reference to a separate but similar cause of action under art. 129 of the Brazilian Bankruptcy Law, which permits challenges to establishment sales when the debtor is in bankruptcy. But the Brazil court overseeing the Debtors' bankruptcy case ruled that such a cause of action could challenge only transactions that occurred within 90 days before the commencement of the Debtors' original reorganization case. Here, the sale-leaseback transaction occurred in September 2014, whereas the Debtors' request for reorganization was filed on April 17, 2015, more than 90 days later. Accordingly, art. 129 does not apply. Seijo Decl. ¶¶ 27-28.

## II.      PLAINTIFF LACKS STANDING.

### A.      Plaintiff lacks Article III standing.

The central premise of the amended complaints is that it was improper for the Borrowers to monetize the assets that acted as the Defendants' collateral and repay their secured loans because that money instead should have been used to satisfy the unsecured creditors of the Debtors. On this basis, Plaintiff asserts that it is suing "on behalf of and for the benefit of creditors" of the *Debtors' estates*. Am. Compl. pp. 2–3, ¶¶ 1, 100. But the Borrowers are not the Debtors. They are distinct entities: "special purpose vehicle[s]," established as Delaware limited liability companies, whose only connection to the Debtors is that they allegedly share the same ultimate owners, the Schahin brothers. *Id.* ¶¶ 37–39. The Borrowers are not even direct or indirect subsidiaries or shareholders of any of the Debtors. Meanwhile, it is undisputed that the Debtors did not own or have any legal interest in the *Amazonia* or the *Pantanal*, or any other property in the Defendants' collateral package.

This is fatal to Plaintiff's claims. To establish standing under Article III of the Constitution, "[a] plaintiff must (1) allege personal injury (2) fairly traceable to the defendant's allegedly unlawful conduct and (3) likely to be redressed by the requested relief." *Hirsch*, 72 F.3d at 1091 (citation omitted). "A plaintiff must always have suffered a distinct and palpable injury to *himself*[.]" *Id.* (emphasis added; citation and quotation omitted). Because Plaintiff's supposed constituents, the Debtors and their unsecured creditors, had no right to the assets that were monetized in the sale-leaseback transaction, they can trace no injury to the repayment of Defendants' loans out of those assets. They were deprived of nothing to which they had an entitlement. *See, e.g.*, *Hart v. Bank of Am. Home Loans (In re Hart)*, 2015 WL 3895476, at *2 (B.A.P. 9th Cir. June 24, 2015) (debtor lacked standing to challenge disposition of property in which it had "no legal interest").

- 14 -

The most Plaintiff can allege to try to overcome this deficiency is that the creditors of the Debtors "*could have* extended the liquidation or pierced the corporate veil to bring the assets of [the Borrowers] into the [Brazilian liquidation proceedings]" because the entities that Plaintiff labels the "Schahin Group" were purportedly managed "as part of a single integrated economic conglomerate." Am. Compl. ¶ 106 (emphasis added). But what Plaintiff or its constituents "could have" done, but did not do, is irrelevant and does not establish injury sufficient to create Article III standing. As a matter of Brazil law, to make the assets of the Borrowers available to the Debtors' creditors, Plaintiff first would have needed to file a formal motion in the Brazil bankruptcy court seeking to disregard the Borrowers' corporate separateness. Seijo Decl. ¶¶ 11-12. Plaintiff then would have needed to demonstrate to the Brazil court, with competent evidence, that the standards for obtaining this extraordinary relief had been satisfied. Seijo Decl. ¶¶ 13-14. To date, no such motion—and no such showing—has been made in Brazil. *See* Seijo Decl. ¶ 12. The assets of the Borrowers are not now, nor have they ever been, part of the Debtors' bankruptcy estates in Brazil.

Plaintiff's failure to take the necessary steps to even try to bring the Borrowers' assets within the scope of the Brazilian proceedings dooms its claim. Even if it had taken those steps, however, Plaintiff has failed to allege that any such motion in the Brazilian bankruptcy proceedings would have succeeded. As laid out in detail in the Seijo Declaration, Brazil law imposes an enormously high burden on a party seeking to disregard corporate separateness, and the allegations in the amended complaints do not come close to meeting it. Seijo Decl. ¶¶ 13-17.

Additionally, to the extent Plaintiff instead is arguing (in an end-run around the Brazil bankruptcy case) that *this Court* should ignore the corporate distinctions between the Debtors and the Borrowers, it fares no better. Delaware law—under which each of the Borrowers was

- 15 -

formed—governs that question. *See Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) ("The law of the state of incorporation determines when the corporate form will be disregarded . . . ."); *Capmark Fin. Grp., Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 347 (S.D.N.Y. 2013) ("Delaware law governs veil-piercing claims involving Delaware LLCs" (citing *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 177 (2d Cir. 2008))). And Delaware law is incompatible with Plaintiff's allegations.

Grounds for piercing the corporate veil or finding the existence of an alter ego relationship exist only in "exceptional circumstances" because "[l]imited liability is the general rule, not the exception." *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 270 (D. Del. 1989). Plaintiff would have to show: "(1) that the corporation and its shareholders operated as a single economic entity, and (2) that an overall element of injustice or unfairness is present." *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 528 (D. Del. 2008) (citation omitted). To operate as a single economic entity, a parent must exercise "exclusive domination and control [over its subsidiary] . . . to the point that [its subsidiary] no longer has legal or independent significance of its own." *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999). Additionally, "the dominant corporation must have proximately caused plaintiff harm through misuse of this control." *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 987 (Del. Ch. 1987) (citation omitted); *see also Mobil Oil*, 718 F. Supp. at 270 (declining to pierce the corporate veil where the record did not establish that "the corporate form [was used] to perpetrate a fraud or to work an injustice upon [plaintiff]"). The amended complaints allege no control by the Debtors over the Borrowers, or vice versa, let alone that the domination caused any wrongdoing or injury.

Further, courts hold that alter ego allegations fail where the company was incorporated

for and engaged in legitimate business activities. *See, e.g.*, *Kirschner v. CIHLP LLC*, 2017 WL

4402545, at \*6 (S.D.N.Y. Sept. 30, 2017) (no showing that entities existed as a "sham" and "for

no other purpose than as a vehicle for fraud" where plaintiff alleged "that at least some of these

entities were created for legitimate business purposes" (citing *In re BH S & B Holdings LLC*, 420

B.R. 112, 140 (Bankr. S.D.N.Y. 2009), *aff'd as modified*, 807 F. Supp. 2d 199 (S.D.N.Y.

2011))). Plaintiff does not allege that any member of the so-called "Schahin Group," let alone

any of the Borrowers, was set up to be and functioned as a sham.

Finally, where a plaintiff seeks to establish liability for all members of a corporate

structure, it must plead sufficient facts to "establish alter ego liability with respect to each one of

the entities" in that structure. *Goodman v. H.I.G. Cap., LLC (In re Gulf Fleet Holdings, Inc.)*,

491 B.R. 747, 790 (Bankr. W.D. La. 2013) (internal quotation marks omitted); *see also Faulkner

v. Kornman (In re Heritage Org. L.L.C.)*, 413 B.R. 438, 514 n.64 (Bankr. N.D. Tex. 2009);

*accord Tronox Inc. v. Kerr-McGee Oil & Gas Corp. (In re Tronox, Inc.)*, 855 F.3d 84, 106 n.27

(2d Cir. 2017) (for plaintiffs to impose liability on indirect parent, "they would need two veil-

piercings or findings of alter-ego liability—the first to get to . . . the former parent of [the

debtor], and the second to get to . . . the non-debtor ultimate parent."). Far from meeting the

heavy burden of pleading facts regarding each of the distinct corporate relationships implicated

by its sweeping allegations, Plaintiff simply *concludes* that all entities in what it calls the

"Schahin Group" can be lumped together. References to several entities as a group do not suffice

for the purpose of a veil-piercing claim. *See*, *e.g.*, *Am. Lecithin Co. v. Rebmann*, 2017 WL

4402535, at \*9 (S.D.N.Y. Sept. 30, 2017) ("The fact that [certain] companies were referred to as

the 'Lipoid Group' is not sufficient to support a finding that Lipoid V and Lipoid G were [the

ultimate owner's] alter egos."). In *Heritage*, for example, the court rejected a "global

application" of an alter-ego theory because plaintiff failed to allege veil-piercing at "each level or

layer of ownership . . . within the multi-faceted entity structure." *In re Heritage*, 413 B.R. at 514-

15.[10]

      Plaintiff's indiscriminate and conclusory statements about veil-piercing therefore must be

rejected. And having failed to allege that the Debtors' unsecured creditors could be satisfied out

of the Borrowers' pledged assets, the amended complaints fail for lack of standing.

      **B.    Plaintiff lacks prudential standing.**

      Even if Plaintiff somehow could succeed in collapsing the corporate forms of all the

entities in the "Schahin Group" and sue on their behalf, it would lack standing for a different

reason. The *Wagoner* rule in the Second Circuit holds that if the debtor participated in the

conduct being challenged, such that New York's *in pari delicto* doctrine would have barred the

debtor from suing outside bankruptcy, an estate representative suing in bankruptcy is similarly

barred. *Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54,

63 (2d Cir. 2013) (citing cases, including *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d

114, 120 (2d Cir. 1991)). This rule applies to foreign liquidators. *ICP Strategic Credit Income

Fund, Ltd. v. DLA Piper L.L.P. (US) (In re ICP Strategic Income Fund, Ltd.)*, 730 F. App'x 78,

82 (2d Cir. 2018) (citing *The Mediators, Inc. v. Manney (In re The Mediators, Inc.)*, 105 F.3d

822, 825-26 (2d Cir. 1997)). The *Wagoner* rule acts as both an equitable defense and a bar to

---

[10] As part of this burden, Plaintiff also would have to disregard the corporate separateness of Sea Biscuit, a British Virgin Islands entity and the Borrowers' immediate parent. The British Virgin Islands follow English law on veil piercing, which requires a plaintiff to show, among other things, that the corporate form was interposed by a wrongdoer for the specific purpose of evading a preexisting liability. *See Centauro Liquid Opps. Master Fund, L.P. v. Bazzoni*, 2016 WL 5719793, at *4 (S.D.N.Y. Sept. 30, 2016) (citing *In re Tyson*, 433 B.R. 68, 81-82, 86 (Bankr. S.D.N.Y. 2010)); see also *Tianbo Huang v. iTV Media, Inc.*, 13 F. Supp. 3d 246, 259 (E.D.N.Y. 2014). Plaintiff has alleged no such facts with respect to Sea Biscuit or any other entity, nor could it.

prudential standing. *Hosking v. TPG Cap. Mgmt., L.P. (In re Hellas Telecomms. (Lux.) II SCA)*, 524 B.R. 488, 531 (Bankr. S.D.N.Y. 2015).

Plaintiff repeatedly alleges that the "Schahin Group" and its agents were involved in the sale-leaseback transaction, the alleged failure to obtain creditor consent for the transaction, and the alleged failure to maximize the value of the rigs. Am. Compl. ¶ 70 ("*The Schahin Group's* lead negotiators in the sale-leaseback transaction were Eonio Rocha and Gustavo Shinohara, CEO and CFO, respectively, of both Schahin Petróleo e Gás S/A, n/k/a Base Petróleo e Gás S/A, and Schahin Oil & Gas Ltd. The Schahin brothers granted Rocha and Shinohara powers of attorney to act on behalf of [the Borrowers] in connection with the transaction." (emphasis added)), ¶ 111 (The "*Schahin Group* did not . . . obtain its creditors' consent, or pay its debts before selling the rigs." (emphasis added)), ¶¶ 70, 128 (Rocha and Shinohara were the "*Schahin Group's* lead negotiators in the sale-leaseback transaction" and they "knowingly sold the *Amazonia* and *Pantanal* for substantially less than their appraised value" (emphasis added)). This is a classic case for application of the *Wagoner* rule.

In an attempt to avoid the *Wagoner* rule, Plaintiff asserts (in conclusory fashion) that under Brazil law, it "acts not solely on behalf of the bankrupt estate, but also on behalf of and for the benefit of its creditors." *Id.* ¶ 100. Plaintiff cites no provision of Brazil law to support that legal conclusion. Further, Plaintiff is being slippery. In a declaration submitted in support of chapter 15 recognition, the then-judicial administrator stated that it acted only "for the benefit of creditors." *See In re Schahin Holdings S.A., et al.*, Case No. 1:19-bk-19932 (Bankr. S.D. Fla.), Dkt. No. 2, Ex. A, § D, ¶¶ 6, 10. There is an important "distinction between a trustee standing in a debtor's shoes suing for the *benefit of creditors* versus suing *as a creditor*." *In re Bos. Generating*, 617 B.R. at 468 (emphasis in original); *see also Barnet v. Drawbridge Special*

*Opportunities Fund LP*, 2014 WL 4393320, at *16 (S.D.N.Y. Sept. 5, 2014) (foreign liquidators with fiduciary duty to creditors under Australian law sued "in their capacity as liquidators of the . . . estate and not as representatives of any creditors").

The *Wagoner* rule precludes an estate representative from bringing claims, like those brought here, that allege a dissipation of assets—an injury to the entirety of the estate—and that seek to recover wrongfully transferred value "for the benefit" of all creditors. *E.g.*, *In re The Mediators*, 105 F.3d at 826 (creditors' committee claim for aiding and abetting breach of fiduciary duty barred for "cooperating in the very misconduct that [the debtor] had initiated."); *In re Magnesium*, 399 B.R. at 758-60 (trustee lacked standing to bring claims of aiding and abetting breach of fiduciary duty). Thus, to the extent Plaintiff seeks merely to recover "on behalf of" or "for the benefit of" the creditors of the entities it labels the "Schahin Group," it cannot side-step imputation of that group's participation in the alleged conduct by asserting that it also represents the "creditors' interests" or the "estate." *See, e.g.*, *Bullmore v. Ernst & Young Cayman Is.*, 861 N.Y.S.2d 578, 586 (Sup. Ct. N.Y. Cnty. 2008) (finding that there is no "innocent successor" exception to the *Wagoner* rule for a foreign liquidator seeking recovery for the benefit of innocent investors).

## III.   PLAINTIFF'S CLAIMS FAIL ON THE MERITS.

### A.   Plaintiff does not state a claim of unjust enrichment.

To plead an unjust enrichment claim under New York law, a plaintiff must allege that: "(1) the defendant was enriched, (2) at the expense of the plaintiff, and (3) [] it would be inequitable to permit the defendant to retain that which is claimed by the plaintiff." *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 458 (S.D.N.Y. 2016) (quoting *Clifford R. Gray, Inc. v. LeChase Constr. Servs., LLC*, 819 N.Y.S.2d 182, 187 (App. Div. 2006)). Plaintiff fails to allege the essential elements of such a claim.

### 1.    Receiving repayment of a valid debt is not "unjust enrichment."

Plaintiff does not and cannot plead that it would be unjust or inequitable to permit Defendants to retain the proceeds of the sale of the *Amazonia* and *Pantanal* to ICBC (or, in the case of collateral agent DBTCA, the fees it received under the relevant agreements). Plaintiff does not dispute that Defendants received exactly what they were owed under their concededly valid Credit Agreements with the Borrowers.

It is well established in New York and elsewhere that repayment of a valid debt is not in any way "wrongful," even if the effect is to leave the debtor unable to repay other creditors. *E.g.*, *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 949 F. Supp. 2d 486, 513 (S.D.N.Y. 2013) (identifying "the rule that repayment of a debt cannot be unjust enrichment" and collecting cases); *Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*, 599 N.Y.S.2d 816, 819-20 (App. Div. 1993); *accord United States v. Goforth*, 465 F.3d 730, 734 (6th Cir. 2006) (rejecting unjust enrichment claim because repayment of loan "was simply the fulfillment of a contractual obligation, and it conferred no 'benefit'"). As Judge Easterbrook put it in *B.E.L.T., Inc. v. Wachovia Corporation*: "Anyway, repayment of a loan is not 'unjust' enrichment." 403 F.3d 474, 477 (7th Cir. 2005).

The First Department's decision in *Ultramar* is directly on point. Chase made advances to the debtor, Drexel, to finance the purchase of crude oil, and it took as security an assignment of accounts receivable owing to Drexel from third-party vendees. *Ultramar*, 599 N.Y.S.2d at 818. Ultramar, an unsecured creditor of Drexel, argued that it was inequitable for Chase to accept the proceeds of the accounts receivable, since those receivables allegedly arose in connection with Ultramar's dealings with Drexel, and because Ultramar was left unpaid. *Id.* at 818-19. In rejecting an unjust enrichment claim, the court held that "[u]nder New York law, Chase, as a creditor, secured or unsecured, was entitled to demand and receive payment of its debt from any

- 21 -

source available to its obligor, Drexel. That such payment deprives the obligor of funds to satisfy

other creditors does not convert the creditor who is paid into a guarantor for other creditors who

are not paid." *Id.* at 819. It did not matter, the court held, whether Chase knew of Drexel's

insolvency or even that Drexel intended to prefer Chase over other creditors: "[e]ven though

insolvent, a debtor may properly assign assets to a creditor as security for an antecedent debt

although the effect of the transfer will be to prefer that creditor." *Id.* Similarly, there is no duty of

a secured creditor "to cure its debtor's non-performance of a collateral obligation to another

creditor as a condition to its receipt of funds in which it has a security interest." *Id.* To hold

otherwise would have given Ultramar, an unsecured creditor, a claim to the collateral superior to

Chase's, which would "do violence to the principles of priority." *Id.*

       The same reasoning applies here. The amended complaints do not, and cannot, allege that

Defendants' loans were invalid, that Defendants received more than they were owed, or that

Defendants got paid out of assets in which another party had a more senior security interest. To

the contrary, Plaintiff concedes that Defendants got exactly what they bargained for in their

Credit Agreements. Meanwhile, the Borrowers' obligations under the Credit Agreements were

assigned to Sea Biscuit and satisfied, and the Borrowers remained in possession of the rigs, just

subject to a new financing arrangement with ICBC. This precludes any allegation that

Defendants were "unjustly enriched." *See, e.g.*, *Mendelsohn v. Kovalchuk (In re APCO Merch.*

*Servs., Inc.)*, 585 B.R. 306, 321 (Bankr. E.D.N.Y. 2018) ("As long as the transferor received a

benefit[,] . . . the transferee is not liable on an unjust enrichment claim." (citation omitted)). For

similar reasons, Plaintiff cannot allege that it would be unjust or inequitable to permit DBTCA to

retain the fees it received in its capacity as collateral agent under the Credit Agreements. *See*

Am. Compl. ¶¶ 86, 119. Plaintiff does not even plead that DBTCA was "enriched" by the receipt

21-01216-lgb    Doc 40    Filed 05/19/22    Entered 05/19/22 20:00:08    Main Document
Pg 32 of 52

of those fees; rather, Plaintiff alleges that DBTCA simply "received fees for its services in carrying out the transactions required by the Assignment Agreement." *See* Am. Compl. ¶¶ 86, 119. That is not unjust enrichment.

> **2.    The unjust-enrichment claim is not supported by allegations that the sale-leaseback transaction violated Brazil law.**

Plaintiff alleges that the sale to ICBC violated Brazil law because it constituted an "establishment sale" by the entities Plaintiff labels the "Schahin Group" and was impermissibly undertaken without the consent of their creditors. Am. Compl. ¶¶ 109–113. This theory fails.

The Brazil statutory provisions laying out restrictions on establishment sales did not apply to the sale-leaseback transaction for at least three reasons. *See* Seijo Decl. ¶¶ 24-34. *First*, the *Amazonia* and *Pantanal* did not comprise even a part of the establishment *of the Debtors*; rather, those assets belonged exclusively to the Borrowers. Thus, no vote of the Debtors' creditors could have been required, and Plaintiff of course does not represent the Borrowers' creditors. Seijo Decl. ¶ 25. *Second*, even as to the Borrowers, the sale of an establishment requires creditor consent only when it results in the disposition of the operations of the business and the ability of the seller to derive benefits from the assets. Seijo Decl. ¶¶ 30-31. That is not what happened here. To the contrary, the Borrowers retained possession of the *Amazonia* and the *Pantanal* and agreed to make periodic payments to ICBC in exchange for continued use. The transaction, in other words, was a *financing*, not an alienation of all rights to use the assets to generate income. *Third*, Plaintiff alleges that "[a]t the time of the sale-leaseback, the Schahin Group owned five oil rigs" (Am. Compl. ¶ 110), meaning there were three other vessels in the fleet, in addition to the *Amazonia* and *Pantanal*, that were not conveyed. Thus, under Brazil law, the restrictions on establishment sales did not apply. Seijo Decl. ¶¶ 30, 32-33.

Regardless, even if Plaintiff could establish a violation of Brazil law, its claim still would have to be dismissed. The rule that a repayment of a debt cannot be unjust enrichment applies even where a debtor allegedly uses improper means to generate the money to make the repayment. As the court in *Ultramar* held, a creditor is entitled to "receive payment of its debt from *any source* available to its obligor." 599 N.Y.S.2d at 819 (emphasis added). The Second Circuit has applied this holding from *Ultramar* and ruled that even where a debtor uses unlawful means to generate funds to repay a debt, and even where the repaid creditor knows that illegality is taking place, the repayment is not wrongful under New York common law. *See Sharp Int'l Corp. v. State St. Bank & Tr. Co.* (*In re Sharp Int'l Corp.*), 403 F.3d 43, 54-55 (2d Cir. 2005) (no liability for creditor that demanded and received repayment of its valid loan, allegedly knowing debtor was engaging in fraud to raise funds (citing *Ultramar*, 599 N.Y.S.2d at 819)). The facts alleged here are a far cry from those alleged in *Sharp*, and thus, if anything, the principle applies with even greater force here. A creditor's receipt of repayment on a valid loan cannot be unjust enrichment just because there is an allegation that foreign law required a creditor vote on the transaction.

### 3.    The alleged enrichment was not at Plaintiff's expense.

For the same reason Plaintiff lacks standing, Plaintiff has failed to plead that Defendants were enriched at the expense of *Plaintiff*, which purports to represent the Debtors and sue for the benefit of their unsecured creditors. Defendants had no privity with the Debtors or their creditors; instead, they were secured lenders only to the Borrowers, entirely separate entities. And the repayment they received was from the property of the Borrowers that served as collateral to secure their loans, to which the Debtors and their unsecured creditors had no entitlement. The connection between the Defendants and the Debtors' unsecured creditors therefore is "too attenuated" to support an unjust enrichment claim. *See supra* Part II.A; *Ga.*

- 24 -

*Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516-18 (2012); *Cohen v. BMW Invs. L.P.*, 144 F. Supp.

3d 492, 500-01 (S.D.N.Y. 2015) ("[A] plaintiff cannot succeed on an unjust enrichment claim

unless it has a sufficiently close relationship with the other party." (citation and internal

quotation marks omitted)).

Likewise, Plaintiff cannot demonstrate that the Debtors or their creditors had a

"possessory interest" in the money or benefit in question. *UPS Store, Inc. v. Hagan*, 99 F. Supp.

3d 426, 439 (S.D.N.Y. 2015) ("An unjust enrichment claim 'lies only where the defendant

possesses money or received a benefit which in equity and good conscience the defendant should

not retain because it *belongs to the plaintiff*.'" (emphasis added; citation omitted)); *see also*

*Mueller v. Michael Janssen Gallery Pte. Ltd.*, 225 F. Supp. 3d 201, 209 (S.D.N.Y. 2016) ("[A]

plaintiff cannot recover under an unjust enrichment theory where the plaintiff did not pay the

[money] in question."); *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142

(2009) (dismissing an unjust enrichment claim where IDT "does not, and cannot, allege that

Morgan Stanley has been unjustly enriched at IDT's expense, because IDT did not pay the

alleged fees"). Rather, Plaintiff's constituents were creditors only of non-Borrowers, and they

were unsecured to boot.

### B.    Plaintiff does not state a claim for aiding and abetting breach of fiduciary duty.

Under New York law, aiding and abetting a breach of fiduciary duty requires proof

(1) of the breach of fiduciary duties of another, of which the defendant had "actual knowledge";

(2) "that the defendant knowingly induced or participated in the breach"; and (3) "that [the]

plaintiff suffered damage as a result of the breach." *Sharp*, 403 F.3d at 49 (quoting *Kaufman v.*

*Cohen*, 760 N.Y.S.2d 157, 169 (App. Div. 2003)). Plaintiff has not alleged facts sufficient to

plead these elements.

1.      **Plaintiff does not allege a breach of a duty owed to, or damages suffered by, its constituents.**

A threshold problem with Plaintiff's claim is that it does not allege the breach of any duty owed to the Debtors or their creditors, which Plaintiff purports to represent. The amended complaints conclude vaguely that Rocha and Shinohara "owed fiduciary duties to the Schahin Group and its creditors," but they make no distinctions among the many entities in the "Schahin Group," let alone a distinction between the Debtors and the Borrowers. None of the Debtor entities owned the rigs, however, and so none of them (or their creditors) were owed any duty by Rocha and Shinohara to maximize the value of the rigs in the sale to ICBC. Only the Borrowers could have a complaint about their agents selling their assets for allegedly less than fair value. Plaintiff does not represent them.

For the same reason, Plaintiff cannot allege that the Debtors or their creditors were damaged by Rocha and Shinohara's alleged conduct. This, again, is because those entities had no entitlement to the proceeds of the sale of the Borrowers' assets, regardless of whether that sale was at fair market value or otherwise. *See Nguyen v. FXCM Inc.*, 364 F. Supp. 3d 227, 243 (S.D.N.Y. 2019) (dismissing claim for aiding and abetting a breach of fiduciary duty where plaintiffs "failed to plead any actual damages" caused by defendants' alleged conduct).

2.      **Plaintiff does not allege actual knowledge of any breach.**

Aiding and abetting requires that the defendant knew of the underlying breach at the time it was committed. The amended complaints allege only that Defendants became aware of Rocha and Shinohara's alleged conflict of interest nine months after the fact. Am. Compl. ¶¶ 96–97. As a matter of basic logic, without contemporaneous knowledge of a breach, there is no way Defendants could be said to have knowingly facilitated that breach. *See Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 412 (S.D.N.Y. 2021) ("[I]t is critical to consider whether BNYM had

- 26 -

actual knowledge of the OneCoin fraud *at the time that it engaged in the conduct* on which Plaintiffs' claim . . . is based." (emphasis added)).

Plaintiff also alleges that the *Amazonia* and *Pantanal* had been appraised "[o]nly months" before the sale-leaseback transaction at a value that was $274 million more than the eventual sale price; it then goes on to say, in a purely conclusory way, that Defendants "were aware of the rigs' true value" merely because they were "the rigs' financiers and Schahin Group creditors." Am. Compl. ¶¶ 73, 129. Yet the amended complaints fail to plead facts sufficient to make this bare conclusion of knowledge plausible. Nowhere do they allege that Defendants received and reviewed the appraisals or considered them to be accurate. Moreover, the price obtained in a transaction between a willing buyer and a willing seller, negotiated at arms' length, is conclusive evidence of fair market value—and far more compelling than any desktop appraisal could be. *See, e.g.*, *In re Bos. Generating, LLC*, 440 B.R. 302, 325-26 (Bankr. S.D.N.Y. 2010) ("[A]bsent a showing that there has been a clear market failure, the behavior in the marketplace is the best indicator of enterprise value."). If, as Plaintiff concedes, Defendants did not know at the time of the sale of any conflict of interest tainting Rocha and Shinohara, they had no reason to suspect that the negotiations yielded anything other than a fair, accurate, market-tested value for the rigs.

### 3.    Plaintiff does not allege inducement or participation.

Inducement is "[t]he act or process of enticing or persuading another person to take a certain course of action." *Sharp*, 403 F.3d at 50 (quoting *Inducement,* Black's Law Dictionary at 790 (8th ed. 2004)). Participation occurs only when an alleged aider and abettor provides "substantial assistance" to the primary violators in breaching their fiduciary duties. *Id.* (quoting *Kaufman*, 760 N.Y.S.2d at 170). "Substantial assistance may only be found where the alleged aider and abettor 'affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur.'" *Id*.

Plaintiff alleges that Defendants "participated" in the sale-leaseback transaction by taking a "role in the negotiations" and seeking to "ensure that the sale-leaseback occurred promptly and generated enough proceeds to settle their loans." Am. Compl. ¶¶ 4, 71–73. But the only facts it alleges to support these conclusory assertions are that one employee of one secured lender "requested" drafts of the transaction documents and wanted to close the transaction "promptly"; that an affiliate of one other secured lender "asked . . . for information" concerning the deal; and that the lenders executed an agreement specifying how their loans would be repaid. *Id.* ¶¶ 71–73, 80.

None of this amounts to "substantial assistance." The amended complaints are devoid of any allegations that Defendants enticed or persuaded Rocha and Shinohara to violate their duties (assuming any duties were even violated). Defendants merely were paid what they were owed, and that is not actionable. *See Epiphany Cmty. Nursery Sch. v. Levey*, 94 N.Y.S.3d 1, 8 (App. Div. 2019) (allegations that the "defendants assisted, facilitated and accepted the bank transfers" insufficient to establish claim for aiding and abetting breach of fiduciary duty).

The Second Circuit's decision in *Sharp* is again instructive, as it shows that a creditor's desire to be repaid—even when it pressures the debtor to use improper means to generate funds for a repayment, facts not present here—does not establish aiding and abetting. There, a creditor (State Street) began to suspect that its debtor (Sharp) was fraudulently inflating its financial statements to support borrowings from other lenders. *Sharp*, 403 F.3d at 47. State Street confirmed the fraud through its own investigation and then endeavored to recover the money Sharp owed it. *Id.* State Street demanded that Sharp obtain new financing from investors unaware of the fraud and use the proceeds to retire the State Street debt. *Id.* Sharp complied, and State Street was repaid out of the proceeds of the fraud without warning others. *Id.* at 48.

- 28 -

In Sharp's bankruptcy, the debtor sued State Street for aiding and abetting breach of fiduciary duty, and the Second Circuit affirmed dismissal of the claim. The court concluded that plaintiff failed to meet its pleading burden since "the complaint [said] no more than that State Street relied on its own wits and resources to extricate itself from peril, without warning persons it had no duty to warn." *Id.* at 51. The allegation that State Street demanded and obtained repayment of precisely what it was owed could not "be characterized as either participation or substantial assistance," because "demand for repayment of a bona fide debt is not a corrupt inducement that would create aider and abettor liability." *Id.* Its provision of contractual consent to allow Sharp to raise the funds also was "not an inducement," nor was it "affirmative assistance," as it "merely removed an impediment" that "was reserved to State Street to invoke or not in its own interest." *Id.* at 52. Similarly, here, the most Defendants are alleged to have done is accept payment they were entitled to receive and sign documents allowing it to happen.

## IV.    PLAINTIFF FAILS TO PLEAD PERSONAL JURISDICTION OVER MOST DEFENDANTS.

Plaintiff fails to plead that this Court has personal jurisdiction over 19 of the 23 Defendants (the "<u>Jurisdictional Objectors</u>").[11] The Jurisdictional Objectors are not subject to general jurisdiction because they all are international entities or foreign businesses with places of incorporation and principal places of business outside New York. *See, e.g.*, *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (no general jurisdiction except where defendant is incorporated or has a principal place of business); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 WL 6243526, at *27 n.43 (S.D.N.Y. 2015), *rev'd on other grounds*, 2022 WL 569819 (2d Cir. Feb. 25, 2022) ("[W]e cannot agree . . . that even very substantial corporate

---

[11] A list of the Jurisdictional Objectors is set forth in Perry Decl. Ex. C.

operations (regardless of whether measured in money, personnel, space, or time) in a given

forum suffice to make a defendant at home in the forum."). The Jurisdictional Objectors are

international financial institutions with principal places of business in jurisdictions across the

world, including China, Japan, South Korea, the United Kingdom, Italy, France, Spain,

Germany, Grand Cayman, Brazil, and Washington, D.C. *See* Am. Compl. ¶¶ 13–29; Case

No. 21-ap-01216 Am. Compl. ¶ 19.

> A.     **Plaintiff does not allege sufficient contacts between the conduct underlying the claims and New York.**

Absent general jurisdiction, Plaintiff must allege grounds for specific jurisdiction that

comport with both New York's long-arm statute and due process. *E.g.*, *Mario Valente Collezioni,*

*Ltd. v. Confezioni Semeraro Paolo, S.R.L.*, 264 F.3d 32, 37 (2d Cir. 2001). It fails on both fronts.

The only conceivably applicable prong of New York's long-arm statute is the one

conferring personal jurisdiction over non-domiciliary defendants who "transact[] any business

within the state or contract[] anywhere to supply goods or services in the state." N.Y. C.P.L.R.

§ 302(a)(1). When determining whether this prong is satisfied, courts consider the totality of the

circumstances, examining factors such as: "(i) whether the defendant has [an] on-going

contractual relationship with a New York corporation, (ii) whether the contract was negotiated or

executed in New York, and whether, after executing a contract with a New York business, the

defendant has visited New York for the purpose of meeting with parties to the contract regarding

the relationship, (iii) what the choice-of-law clause is in any such contract, and (iv) whether the

contract requires [the defendant] to send notices and payments into the forum state or subjects

them to supervision by the corporation in the forum state." *Barrett v. Tema Dev. (1988), Inc.*,

463 F. Supp. 2d 423, 430 (S.D.N.Y. 2006) (quoting *Agency Rent A Car Sys. v. Grand Rent A Car*

*Corp.*, 98 F.3d 25, 29 (2d Cir. 1996)).

Plaintiff pleads facts that are overwhelmingly foreign. The conduct Plaintiff challenges centers around the refinancing of the *Amazonia* and *Pantanal*, which were located outside of the United States. The owners of the rigs—the Borrowers—are Delaware entities owned by Brazil and British Virgin Island parent companies (Am. Compl. ¶¶ 37–39), and the sale of the rigs was to a subsidiary of a Chinese bank (*id.* ¶ 4). Plaintiff can point only to two specific ties between the Jurisdictional Objectors and the forum, which are neither individually nor collectively sufficient.

*First*, Plaintiff alleges that the closing of the sale-leaseback transaction took place in the New York office of Linklaters LLP, which only Mitsubishi attended in person, and which other Defendants merely joined by "conference call." Am. Compl. ¶ 74. Plaintiff further alleges that "[o]ther" unspecified meetings "related to the transaction" were held in New York but fails to allege that any Defendants attended those meetings or participated in any way. *Id.* This is insufficient to confer specific jurisdiction. *See, e.g.*, *Pincione v. D'Alfonso*, 506 F. App'x 22, 25 (2d Cir. 2012) (defendants' alleged contacts consisting "principally of correspondence, telephone calls, and participation in telephone and video conferences . . . were intended to facilitate a business deal in Italy," and defendant's agent's physical presence in New York for initial meetings with plaintiff was insufficient to "transform th[e] fundamentally Italian deal into a New York business transaction"); *see also Bhutan Int'l Festival, Ltd. v. Eden Project*, 2018 WL 6329402, at *6 (S.D.N.Y. Dec. 3, 2018); *Maranga v. Vira*, 386 F. Supp. 2d 299, 306 (S.D.N.Y. 2005) ("[C]ommunications into New York will only be sufficient to establish personal jurisdiction if they were related to some transaction that had its center of gravity inside New York, into which a defendant projected himself." (citations and internal quotation marks omitted)). The "center of gravity" of the sale-leaseback transaction was not New York; the

Jurisdictional Objectors' alleged transient presence in New York, telephonic or otherwise, pertained to a deal that "fundamentally" occurred elsewhere.

Mitsubishi's representation at contract signing also is insufficient, as "both [the Second Circuit] and the New York Court of Appeals have held that the execution of a contract in New York, by itself, is inadequate to sustain jurisdiction." *Berkshire Cap. Grp., LLC v. Palmet Ventures, LLC*, 307 F. App'x 479, 480 (2d Cir. 2008); *see also Galgay v. Bulletin Co.*, 504 F.2d 1062, 1065-66 (2d Cir. 1974); *Anderson v. Ind. Black Expo, Inc.*, 81 F. Supp. 2d 494, 502 (S.D.N.Y. 2000) (defendant's "physical presence in New York at the time of [contract] signing does not itself warrant an exercise of jurisdiction over the defendants"); *Nutmeg Ins. Co. v. Iowa Mut. Ins. Co.*, 2005 WL 1529523, at \*4 (S.D.N.Y. June 29, 2005) ("unfair and prejudicial" to establish jurisdiction based solely on fact that "contract was unilaterally executed in its final form" by party within New York).

*Second*, Plaintiff alleges that most of the Jurisdictional Objectors received or delivered payment in New York bank accounts. Am. Compl. ¶¶ 10, 80–81. But a single transfer to a New York account, relating to a foreign transaction, is inadequate as a matter of law to confer jurisdiction. *See, e.g.*, *Vasquez v. H.K. & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 264 (S.D.N.Y. 2020) (dismissing a complaint against a foreign defendant for lack of jurisdiction even though the defendant wired money through New York correspondent bank accounts); *see also Amigo Foods Corp. v. Marine Midland Bank-N.Y.*, 39 N.Y.2d 391, 396 (1976) ("[S]tanding by itself, a correspondent bank relationship, without any other indicia or evidence to explain its essence, may not form the basis for long-arm jurisdiction under CPLR 302.").[12]

---

[12] BOC *did not* designate a New York bank account to receive its funds. Case No. 21-ap-01216, Am Compl. ¶ 63. Instead, BOC designated and received its funds into an account at its branch in Shenzhen, China. The fact that Black Gold, one of the Borrowers, wired the funds from its account in New York to BOC's account in Shenzhen means

This is enough to end the analysis without resorting to a due process inquiry. *E.g.*, *Vasquez*, 477 F. Supp. 3d at 264. Nevertheless, the constitutional analysis leads to the same conclusion. Due process requires Plaintiff to point to "minimum contacts" with New York—and, in particular, to allege facts supporting the conclusion that Defendants' suit-based conduct was specifically and intentionally directed at New York such that it would be fair to bring Defendants to court here. *See, e.g.*, *Ford Motor Co. w. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024-25 (2021). The contacts between a defendant and the forum state must not be "random, isolated, or fortuitous," but must instead "show that the defendant deliberately reached out beyond its home—by, for example, exploiting a market in the forum State or entering a contractual relationship centered there." *Id.* at 1025 (citation and internal quotation marks omitted).

This standard is not met. The Borrowers, Delaware entities, sold oil rigs that were located outside of the United States to a subsidiary of a Chinese bank that is not a defendant here, and repaid foreign financial institutions. Plaintiff does not allege that any of the supposedly aggrieved creditors of the Debtors are located in or suffered an injury in New York. There is no indication on the face of the pleadings that any suit-based conduct was directed toward the forum.

### B.    Defendants did not consent to jurisdiction in New York.

Plaintiff alleges that the Defendants consented to personal jurisdiction in New York by virtue of the forum-selection provisions in the Credit Agreements and Assignment Agreement.

---

that the *Borrowers* may have availed themselves of the New York banking system, not BOC. *See Vasquez v. H.K. & Shanghai Banking Corp.*, 2019 WL 2327810, at *12 (S.D.N.Y. May 29, 2019) ("If, for example, plaintiffs' local banks made the decision to use that correspondent account for their own convenience, then the facts here would appear more analogous to those of *Amigo Foods*, in which the defendant bank had not made the choice to use the local account."). Further, Black Gold's payment from a New York account to BOC in China relating to a primarily non-U.S. transaction would not satisfy minimum contacts under the requisite due process inquiry. *See Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 416 (1984) (the fact that funds were sent from the forum state is of "negligible significance" in terms of determining minimum contacts for the recipient).

Am. Compl. ¶ 11. This is unavailing. Neither the Debtors nor their creditors were parties to those

agreements; rather, those contracts were between non-Debtors and Defendants. Plaintiff

emphasized that very point in one of its pre-motion letters, asserting that the "creditors on whose

behalf Plaintiff is acting were *not* signatories" to the agreements. (Dkt. No. 1-90 at 7) (emphasis

in original). As a result, Plaintiff cannot enforce the forum-selection clauses. *See, e.g.*, *Ramiro

Aviles v. S&P Glob., Inc.*, 380 F. Supp. 3d 221, 259 (S.D.N.Y. 2019); *Vuzix Corp. v. Pearson*,

2019 WL 5865342, at \*5 (S.D.N.Y. Nov. 6, 2019) (plaintiff could not invoke forum selection

clause in a contract to which it was not a signatory).

A non-signatory may enforce a forum-selection clause only in limited circumstances that

are not present here. The non-signatory must have been so "closely related" to the signatory that

the "enforcement of the forum selection clause [was] 'foreseeable'" to the signatory. *Magi XXI,

Inc. v. Stato Della Città Del Vaticano*, 818 F. Supp. 2d 597, 605-06 (E.D.N.Y. 2011) (citation

omitted). The Borrowers and the Debtors are separate entities and fail to meet this "closely

related" test. They are not even subsidiaries or shareholders of one another, but simply are

alleged to be related by virtue of their common ultimate ownership by the same individuals.

Likewise, the creditors of the "Schahin Group," for whose benefit Plaintiff claims to be suing,

were even further removed from privity with Defendants. And the Credit Agreements and

Assignment Agreement expressly preclude any non-party from claiming any benefits thereunder.

*See, e.g.*, Perry Decl. Ex. A, Amended and Restated Credit Agreement § 12.18 ("[N]o other

person . . . shall have any rights under this agreement[.]"); *see also* Perry Decl. Ex. B, Omnibus

Master Assignment Agreement § 15(d) ("Nothing in this Agreement, expressed or implied, shall

be construed to confer upon any Person (other than the parties hereto, their respective successors

and assigns permitted hereby) any legal or equitable right, remedy or claim under or by reason of this Agreement.").

Given these facts, Plaintiff has no right to rely on the Credit Agreements and the Assignment Agreement to lay jurisdiction. It is implausible to conclude that when Defendants entered into their agreements with the Borrowers—special purpose vehicles with a distinct identity from the rest of the entities Plaintiff labels the "Schahin Group"—they could have foreseen being haled into New York court by a representative of separate entities or their creditors, which had no right to the Borrowers' assets, based on the forum-selection clauses.

## V.    PLAINTIFF CANNOT OVERCOME THE PRESUMPTION OF IMMUNITY FOR THE IMMUNE DEFENDANTS.

The Court can dismiss the amended complaints for the above reasons without having to reach the question of whether any Defendants are immune from suit. *See Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007); *see also Magi XXI, Inc. v. Stato Della Città Del Vaticano*, 714 F.3d 714, 719-20 (2d Cir. 2013); *Luxexpress 2016 Corp. v. Gov't of Ukr.*, 2018 WL 1626143, at *3 (S.D.N.Y. Mar. 30, 2018). In the event the Court reaches the question, subject-matter jurisdiction is lacking over claims against KfW and the International Finance Corporation ("IFC"), two of the Defendants in Case No. 21-ap-01216 (the "Immune Defendants"), because they are protected by the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1605 ("FSIA"), or the International Organizations Immunities Act of 1945, 22 U.S.C. § 288a(b) ("IOIA").

"Under the [FSIA], a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *accord Kling v. World Health Org.*, 532 F. Supp. 3d 141, 149 (S.D.N.Y. 2021)

- 35 -

(international organization is entitled to a presumption of immunity). KfW is a state-owned

entity, and as such it qualifies for immunity from suit under the FSIA.[13] *See* 28 U.S.C. § 1603(a),

(b) ("foreign state" includes "an agency or instrumentality of a foreign state"); *see also OBB*

*Personenverkehr AG v. Sachs*, 577 U.S. 27, 30-31 (2015); *Rogers v. Petroleo Brasileiro, S.A.*,

673 F.3d 131, 136 (2d Cir. 2012); *S & S Mach. Co. v. Masinexportimport*, 706 F.2d 411, 414 (2d

Cir. 1983) (state-owned bank is "indisputably" an agency or instrumentality as defined under the

FSIA). IFC, a designated international organization, is immune because the IOIA grants

international organizations the "same immunity" as foreign sovereigns under the FSIA. *Jam v.*

*Int'l Fin. Corp.*, 139 S. Ct. 759, 772 (2019).

> **A.      The FSIA's commercial activity exception to immunity does not apply.**

Plaintiff bears the initial burden to establish subject-matter jurisdiction by pleading

sufficient facts showing that an FSIA exception applies. *See Eisenberg v. Permanent Mission of*

*Eq. Guinea to U.N.*, 832 F. App'x 38, 39 (2d Cir. 2020); *Pablo Star Ltd. v. Welsh Gov't*, 961

F.3d 555, 560 (2d Cir. 2020). It has failed to do so.

Under the FSIA, a foreign state shall not be immune in any case "in which the action is

based [i] upon a commercial activity carried on in the United States by the foreign state; or [ii]

upon an act performed in the United States in connection with a commercial activity of the

foreign state elsewhere; or [iii] upon an act outside the territory of the United States in

connection with a commercial activity of the foreign state elsewhere and that act causes a direct

effect in the United States." 28 U.S.C. § 1605(a)(2). Without support, Plaintiff merely concludes

---

[13] KfW is a public law institution organized and existing under German law serving public policy objectives of the Federal Republic of Germany. KfW's subscribed capital is majority-owned by the Federal Republic of Germany and minority-owned by the German Federal States.

that all three conditions are satisfied.[14] *See* Case No. 21-ap-01216 Am. Compl. ¶ 9. But to determine whether the exception applies, the Court must examine: (1) the "particular conduct on which the plaintiff's action is based" (*Sachs*, 577 U.S. at 33 (alterations and internal quotation marks omitted)); (2) whether that conduct is commercial in nature (*see* 28 U.S.C. §§ 1603(d), 1605(a)(2)); and (3) whether the conduct has "a sufficient nexus to the United States" under the FSIA (*Jam*, 139 S. Ct. at 772). All three requirements must be satisfied to overcome immunity.

Plaintiff's claim fails under each of these prongs; however, the Court need look no further than the first prong because Plaintiff's suit is not based on *Defendants'* conduct at all. *See* 28 U.S.C. § 1605(a)(2) (to satisfy commercial activity exception, suit must be "based upon" conduct "by the foreign state" or in connection with conduct "of the foreign state"); *see also Devengoechea v. Bolivarian Republic of Venez.*, 889 F.3d 1213, 1222 (11th Cir. 2018) ("All three of the commercial-activity exception's clauses apply only when the action is 'based upon' the conduct that the exception describes." (citing *Nelson*, 507 U.S. at 356)). An action can be held to be "based upon" "particular conduct" only if that conduct constitutes the "gravamen" of the suit. *Sachs*, 577 U.S. at 35. Put another way, for the commercial activity exception to apply, the alleged commercial activity must be the conduct that "actually injured" Plaintiff. *Id.*; *see also Jam v. Int'l Fin. Corp.*, 3 F.4th 405, 409 (D.C. Cir. 2021).

This suit is based entirely on the conduct of non-defendants. *See, e.g.*, Case No. 21-ap-01216 Am. Compl. ¶ 93 ("The Schahin Group did not notify its creditors, obtain its creditors' consent, or pay its debts before selling the rigs."), ¶ 109 ("Rocha and Shinohara violated their duty of care when they knowingly sold the [rigs] for substantially less than their appraised

---

[14] Plaintiff points only to the commercial activity and waiver exceptions to the FSIA. Neither these exceptions nor any other FSIA exceptions apply. *See* 28 U.S.C. § 1605.

value."). Specifically, this suit is based upon the alleged manner in which the *Borrowers* entered into the sale-leaseback transaction with ICBC with the assistance of Rocha and Shinohara. *See* Case No. 21-ap-01216 Am. Compl. ¶¶ 55, 91–95. The *Borrowers*' conduct resulted in Defendants receiving the outstanding principal amount and interest due, and it is this *Borrower* conduct, along with that of Rocha and Shinohara, that allegedly caused harm to the entities Plaintiff purports to represent. *Id.* ¶ 102. The conduct of the Borrowers and their lead negotiators constitutes the gravamen of this suit, and Plaintiff has failed to plead that the *Defendants'* activity is the basis for the alleged injury. As such, the commercial activity exception to sovereign immunity cannot apply.

Moreover, Plaintiff has failed to plead a sufficient nexus between the gravamen of this suit and the United States.[15] Plaintiff is seeking redress for alleged harms to the creditors of the Debtors caused by: (1) the failure to notify the creditors in advance of the sale-leaseback transaction, or obtain their consent; and (2) Rocha and Shinohara negotiating the price of the rigs in bad faith. *See id.* ¶¶ 93, 109. Plaintiff fails to allege any nexus between these events and the United States.

### B.      Immune Defendants did not waive immunity.

Plaintiff summarily asserts that the Immune Defendants waived immunity (*see* Case No. 21-ap-01216 Am. Compl. ¶ 9) yet fails to plead any facts consistent with either an express or an implied waiver. With respect to IFC, the IOIA requires that waiver of organizational immunity

---

[15] Additionally, Plaintiff failed to show that IFC in particular engaged in commercial activity. "[A] foreign state engages in commercial activity . . . only where it acts 'in the manner of a private player within' the market." *Nelson*, 507 U.S. at 360 (quoting *Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 614 (1992)). IFC, consistent with its enabling Articles of Agreement, does not act like a commercial player within the market. Rather, it makes investments where other private capital is not otherwise available on reasonable financial terms. *See* Articles of Agreement of the International Finance Corporation, art. I, sec. 3, Dec. 5, 1955, 7 U.S.T. 2193, T.I.A.S. No. 3620 (as amended through April 16, 2020); *see also Jam*, 139 S. Ct. at 772 ("[I]t is not clear that the lending activity of all development banks qualifies as commercial activity within the meaning of the FSIA.").

be express. *See* 22 U.S.C. § 288a(b). With respect to the other Immune Defendants, the FSIA's implied and explicit waiver provisions are construed narrowly. *See Shapiro v. Republic of Bol.*, 930 F.2d 1013, 1017 (2d Cir. 1991) ("Federal courts have been virtually unanimous in holding that the implied waiver provision of Section 1605(a)(1) must be construed narrowly."); *World Wide Minerals, Ltd. v. Republic of Kaz.*, 296 F.3d 1154, 1161 n.11 (D.C. Cir. 2002) ("This circuit . . . has followed the virtually unanimous precedents construing the implied waiver provision narrowly." (citations and internal quotation marks omitted)); *id*. at 1162 ("In general, explicit waivers of sovereign immunity are narrowly construed 'in favor of the sovereign' and are not enlarged 'beyond what the language requires.'" (quoting *Library of Cong. v. Shaw*, 478 U.S. 310, 318 (1986))).

To the extent that Plaintiff relies on the venue provision in the Credit Agreements as a waiver of immunity (*see, e.g.*, Case No. 21-ap-01216 Am. Compl. ¶ 68), these provisions are not a waiver of immunity in any respect, and certainly not in *this* case. *See Banco de Seguros del Estado v. Int'l Fin. Corp.*, 2007 WL 2746808, at *6 (S.D.N.Y. Sept. 20, 2007) (IFC's waiver in contract with counterparty did not constitute a waiver extending to dealings with third parties) (citing *Corcovado Music Corp. v. Mollis Music, Inc.*, 981 F.2d 679, 682-83 (2d Cir. 1993)). As discussed above, neither Plaintiff nor any of the parties it purports to represent were parties to the Credit Agreements. As a non-signatory, therefore, Plaintiff cannot enforce the venue provisions or claim that they operate as a waiver of immunity in a lawsuit in which Defendants never could have foreseen their invocation.

## <u>CONCLUSION</u>

For the foregoing reasons, the amended complaints should be dismissed with prejudice, in their entirety, and Defendants should be awarded such other relief that the Court deems just and proper.

Dated: May 19, 2022
New York, New York

**MILBANK LLP**

By: */s/ Alexander B. Lees*
_____

Alexander B. Lees
alees@milbank.com
Daniel M. Perry
dperry@milbank.com

*Attorneys for Defendants Banco Bilbao Vizcaya Argentaria, S.A., Banco Bilbao Vizcaya Argentaria, S.A., Grand Cayman Branch, Caterpillar Financial Services Corporation, Credit Industriel et Commercial, Deutsche Bank AG, London Branch, Deutsche Bank Trust Company Americas, Hamburg Commercial Bank AG, Intesa Sanpaolo, S.p.A., New York Branch, Itau BBA International PLC, Mizuho Bank, LTD, Shinhan Bank, Standard Chartered Bank, Unicredit Bank AG, Dexia Credit Local SA, and KfW*

**SULLIVAN & CROMWELL LLP**

By: */s/ Amanda Flug Davidoff*
_____

Amanda Flug Davidoff
davidoffa@sullcrom.com

*Attorneys for Defendant Nomura Corporate Funding Americas, LLC*

**MASUDA,      FUNAI,      EIFERT      &
MITCHELL, LTD.**

By: */s/ David J. Stein*
_____

David J. Stein
dstein@masudafunai.com
Jiwon J. Yhee
jyhee@masudafunai.com

*Attorneys for Defendant Mitsubishi HC Capital (U.S.A.) Inc. f/k/a Mitsubishi UFJ Lease & Finance (U.S.A.) Inc.*

- 40 -

**MAYER BROWN LLP**

By: */s/ Christopher J. Houpt*

    Christopher J. Houpt
    choupt@mayerbrown.com
    Matthew D. Ingber
    mingber@mayerbrown.com

*Attorneys for Defendants Mitsubishi Corporation and MS Drillship I S.A.*

**SIDLEY AUSTIN LLP**

By: */s/ Jeffrey T. Green*

    Jeffery T. Green (admitted pro hac vice)
    jgreen@sidley.com
    Marisa S. West (admitted pro hac vice)
    marisa.west@sidley.com

**JONES DAY**

By: */s/ Dan T. Moss*

    Kevyn D. Orr
    korr@jonesday.com
    Dan T. Moss
    dtmoss@jonesday.com
    Steven T. Cottreau
    scottreau@jonesday.com
    Eric Snyder
    esnyder@jonesday.com

*Attorneys for Defendant International Finance Corporation*

**DORSEY & WHITNEY LLP**

By: */s/ Lanier Saperstein*

    Lanier Saperstein
    saperstein.lanier@dorsey.com
    Daniel P. Goldberger
    goldberger.dan@dorsey.com
    Eric Lopez Schnabel
    schnabel.eric@dorsey.com

*Attorneys for Defendants Bank of China Limited and China Development Bank*

**LAW OFFICE OF STEVEN J. FINK PLLC**

By: */s/ Steven J. Fink*

   Steven J. Fink
   steven.fink@sjfinkpllc.com

*Attorneys for Defendant Portigon AG*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants in this case.

/s/ *Alexander B. Lees*

Alexander B. Lees