**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK (MANHATTAN)**

| | |
|---|---|
| AJ RUIZ CONSULTORIA EMPRESARIAL S.A., solely as Judicial Administrator and foreign representative of SCHAHIN HOLDING S/A, *et al.*, | |
| Plaintiff, | |
| v. | Adv. Case No. 21-01213-lgb |
| BANCO BILBAO VIZCAYA ARGENTARIA, S.A., *et al.*, | |
| Defendants. | |
| AJ RUIZ CONSULTORIA EMPRESARIAL S.A., solely as Judicial Administrator and foreign representative of SCHAHIN HOLDING S/A, *et al.*, | |
| Plaintiff, | |
| v. | Adv. Case No. 21-01216-lgb |
| BANK OF CHINA LIMITED, *et al.*, | |
| Defendants. | |

**DECLARATION OF DR. FRANCISCO SATIRO IN SUPPORT OF**
**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

### D<small>R</small>. F<small>RANCISCO</small> S<small>ATIRO</small>'<small>S</small> D<small>ECLARATION</small> O<small>PPOSING</small> M<small>OTION TO</small> D<small>ISMISS</small>

1. Scope of assignment

1.1    I understand that AJ Ruiz Consultoria Empresarial S.A. has filed two lawsuits as the foreign representative of the Bankrupt Estate of the Schahin Group[1] [Group or Plaintiff] against BANCO BILBAO VIZCAYA ARGENTARIA, S.A., *et al.* – Case No. 21-01213-LGB; and BANK OF CHINA LIMITED, *et al.* – Case No. 21-01216-LGB [Defendants], before the U.S. Bankruptcy Court for the Southern District of New York [S.D.N.Y.].

1.2    In my instructions from the Plaintiff, I have been asked to (a) express my opinions about certain matters of Brazilian law when applied to the facts, matters and assumptions presented to me, (b) confirm whether I agree with the propositions set forth in Item 4, and (c) set out the bases and reasoning in support of my views.  I have also been asked to respond as needed to the May 19, 2022 declaration of Gabriel Seijo Leal de Figueiredo filed by the defendants in the above-mentioned cases.

2. Summary of opinions

2.1    **Regarding the establishment rule under Brazilian Law** if the allegations in Plaintiff's Complaints are true, the oil drilling rigs *Amazonia* and *Pantanal* can and should be considered establishments since they are "*complexes of assets organized by a business*

---

[1] SCHAHIN HOLDING S/A; AGROPECUÁRIA ALTO DO TURIASSÚ LTDA; AGROPECUÁRIA MARANHENSE S/A; ÂMBAR EMPREENDIMENTOS E PARTICIPAÇÕES S/C LTDA; AQUÁTICA COMUNICAÇÕES LTDA; BASE ENGENHARIA E SERVIÇOS DE PETRÓLEO E GÁS S/A; BASE PETRÓLEO E GAS S/A; COMPANHIA MS DE PARTICIPAÇÕES; COMPANHIA SCHAHIN DE ATIVOS; COMPANHIA SCHAHIN SECURITIZADORA DE CRÉDITOS FINANCEIROS S/S LTDA; CONSTRUTORA MOGNO LTDA; DEEP BLACK DRILLING LLP; FOXBOROUGH PARTICIPAÇÕES LTDA; HABITÉCNICA PARTICIPAÇÕES S/A; HABITÉCNICA S/A EMPREENDIMENTOS IMOBILIÁRIOS, ADMINISTRAÇÃO E PLANEJAMENTO; HBF PARTICIPAÇÕES LTDA; HHS PARTICIPAÇÕES S/A; INTELIS AUTOMAÇÃO E CONTROLE LTDA; MTS PARTICIPAÇÕES LTDA; S&S HOLDING ELÉTRICA S/A; S2 PARTICIPAÇÕES LTDA; SATASCH PARTICIPAÇÕES LTDA; SCH 14 SONDAS DE PRODUÇÕES MARÍTIMAS S/A; SCH07 PARTICIPAÇÕES LTDA; SCH08 PARTICIPAÇÕES LTDA; SCH13 PARTICIPAÇÕES LTDA; SCH15 PARTICIPAÇÕES LTDA; SCHAHIN ADMINISTRAÇÃO E INFORMÁTICA LTDA; SCHAHIN ATIVOS COMPANHIA SCHAHIN SECURITIZADORA DE CRÉDITOS FINANCEIROS S/A; SCHAHIN CAPITAL SPE 1 S/A; SCHAHIN CAPITAL SPE 2 S/A; SCHAHIN DESENOLVIMENTO IMOBILIÁRIO S/A; SCHAHIN EMPREENDIMENTOS IMOBILIÁRIOS LTDA; SCHAHIN ENERGIA S/A; SCHAHIN PARTICIPAÇÕES LTDA; SCHAHIN SECURITIZADORA DE CRÉDITOS FINANCEIROS S/A; and SM PARTICIPAÇÕES S/A.

*proprietor or a business company to carry on an enterprise"* pursuant to the definition under Section 1.142 of the Brazilian Civil Code. Brazilian case law has already recognized that oil drilling rigs are establishments and in one case the Schahin Group itself was respondent [*e.g.*: State Labor Court, TRT-1st Region – Labor Appeal n. 0101223-89.2019.5.01.0482].

Therefore, and considering Schahin Group's economic distress that followed the sale lease-back transaction, pursuant to Section 1.145 of the BRAZILIAN CIVIL CODE, the sale of the rigs required [i] the prior payment of all the Schahin Group's creditors; or [ii] the consent of all its creditors, upon notice granting them a period of thirty (30) days to oppose the transaction. Neither of these measures were taken at the time the September 2014 transaction took place.

In view of these facts, upon Schahin Group's liquidation decree, the sale should be considered ineffective before the Estate, since it fulfills the two requirements set forth in Section 129, VI, of the Brazilian Bankruptcy Code: [i] the insufficiency of the debtor's remaining assets to pay its creditors; and [ii] the absence of all the creditors' consent (whether express or not) within thirty (30) days after the notification of the transaction.

2.2    **Regarding the judicial administrator's authority** under Brazilian law the nominated Trustee has no legal duties related to the bankrupt company. The estate is merely a collection of assets [Section 103 and 108 of the Bankruptcy Code] and does not have a legal personality nor succeeds the bankrupt company in its responsibilities. The Trustee is nominated by the bankruptcy court to act as the court's assistant and to represent and manage the estate in the interest of its creditors, solely to maximize the liquidation value of its assets. This, in fact, is a very usual structure in insolvency regimes of Civil Law.

In this sense, Section 22, III, of the Bankruptcy Code establishes several relevant duties of the Trustee, including the duties to "request all measures necessary for (…) protection of the bankruptcy estate or performance of efficient administration" [Section 22, III, "o" of the Bankruptcy Code].

3

As a matter of fact, not only does the nominated Trustee have no legal duty to represent the bankrupt company's interests, or those of its shareholders and officers, but he or she might – and commonly will – act against these interests when pursuing the recovery of the bankrupt estate's assets on behalf of the estate and its creditors' interests. Therefore, the Trustee does not succeed the company or its former directors in bankruptcy to any extent. It acts solely on the interest of the bankruptcy estate and its creditors.

2.3     **Regarding the scope of Brazilian bankruptcy**, assets belonging to other companies related to the Schahin Group can be made available to satisfy its debtors. At least two mechanisms could be used to achieve this: [i] the Schahin Group's bankruptcy extension; and [ii] the piercing of the corporate veil of other companies related to the Group which are not bankrupted.

Through piercing of the corporate veil, as provided in Section 50 of the Brazilian Civil Code, the judge can extend the effects of "<u>certain obligations</u>" incurred by one company or individual to third parties when the Brazilian company (i) used the legal entity to damaging creditors [Section 50, §1º, Brazilian Civil Code] or (ii) violated patrimonial segregation[2] of legal entity's assets [Section 50, §2, Brazilian Civil Code]. Both hypotheses appear to be present here.

A similar goal could be achieved by the bankruptcy extension, but with broader effects. This tool was developed by Brazilian case law, and it is used when there is collusion among two or more companies or individuals to achieve goals prevented by law. It allows liquidation of the debtor to be extended to third parties and, therefore, the whole of third parties' assets become part of the bankrupt estate. It differs from the piercing of the corporate veil because it is not limited to certain obligations and effectively extends the bankruptcy regime to the third party.

---

[2] "Violation of patrimonial segregation" means the intermingling of assets of the group's companies or legal entities represented by, e.g., the deviation of profits to another member of group, the treatment of entities assets as a common pool of resources, the use of common bank accounts or by one company's assets paying other members debts, etc.

4

Both the bankruptcy extension and piercing of the corporate veil could be proper in this case, since the Schahin Group never denied owning these assets, even if they were directly owned by offshore vehicles. Sea Biscuit International Inc., Black Gold Drilling LLC, Baerfield Drilling LLC and Soratu Drilling LLC are all part of the Schahin Group's economic conglomerate, and the offshore companies were used as means of obfuscating the disposal of the Group's assets to avoid claims.

2.4    **Regarding the payment order under the Bankruptcy Code**, there are creditors with priority over secured creditors in bankruptcy proceedings. The Bankruptcy Code provides for several classes of creditors in liquidation, including "super preferred creditors," many of which are ranked prior to the secured ones. Mortgages and liens' collateralized credits are classified in 12th place (Section 83, II), which means that 11 classes of super preferred creditors and ordinary creditors have priority over "secured creditors." The secured creditors, in liquidation, are not entitled to the collateral itself, but only to the proceeds of those assets' sale, to the limit of their credits, and only after the payment of the creditors with higher priority in payment order. That is why, under the Bankruptcy Code, liens and mortgages do not grant secured creditors guaranteed rights on the assets given as collateral, nor on their proceeds.

3.    Qualifications

3.1    I am a full professor of Business Law at the University of São Paulo ("USP") Law School. My areas of concentration as an academic in the law include debtor-creditor, insolvency, corporate and commercial law. I have advanced knowledge of the Brazilian law of claw-back or fraudulent transfer avoidance claims, as well as the law governing the Brazilian insolvency regime [Law No. 11.101/2005].

3.2    I was conferred with a bachelor's degree in law from the University of São Paulo Law School in 1993 and have been a qualified Brazilian lawyer since that year. I was also conferred with a doctorate degree in Business Law in 2002 by the University of São Paulo Law School. I have taught courses in law abroad including at (i) Georgetown University's Center for Transnational Legal Studies (London) (2009-10); (ii) the University of Miami

(2013); (iii) LSGL (Law Schools' Global League) at the Faculdade de Direito de Lisboa, Lisbon, Portugal (2010 – 2013); (iv) ITAM (Instituto Technologico Autonomo do Mexico, Mexico City) (2011), and (v) the Pontificia Universidad Javeriana in Bogota, Colombia (2011).

3.3     In 2016, by official request of the Ministry of the Economy of Brazil, I drafted amendments to the Bankruptcy Code. Also, by request of the Ministry of Industry of Brazil, in 2017 I was part of the working group nominated to draft new regulations to improve the treatment of the financial crisis of small and medium-sized commercial enterprises in Brazil.

3.4     From 2011 to 2015, I served as a member of the CRSFN (or the Court of Appeals of the Brazilian Financial System). During those four years I heard more than 600 appeals and authored more than 80 decisions.

3.5     From 2008 to the present, I have served as one of Brazil's delegates to United Nations Commission on Trade Law - UNCITRAL's Working Group V (Cross-Border Insolvency Law) and Working Group IV (Small and Medium Enterprises Group) in New York and Vienna.

3.6     I attach as Exhibit "A" to my Declaration a copy of my curriculum vitae. I confirm that its contents are true and accurate.

3.7     I am fluent in both the Portuguese and English languages.

3.8     I am being paid for my work in this matter at my ordinary fee of R$180,000 (BRL) plus any extra hour of work at a fee of R$2,000 (BRL). My compensation does not depend on the outcome of this litigation.

4.  Opinions (based on allegations in complaints)

   a.  **Establishment**

       i.  *Amazonia* **and** *Pantanal***, individually and together, were an establishment**

Pursuant to Section 1.142 of the Brazilian Civil Code, an establishment is any *complex of assets organized by a business proprietor or a business company for the purpose of carrying on an enterprise*. In other words, an establishment is a conglomerate of assets or goods used by the entrepreneur to operate a business.

Under Section 1.143 of the Brazilian Civil Code, the establishment represents a unit of rights and obligations, that has its own value (commonly referred to as "goodwill" in Brazilian law), which is different from the sum of the individual value of the goods/assets that compose it – both tangible and intangible. Since it has a going concern value, Section 1.143 of the Brazilian Civil Code provides the establishment can be sold and purchased as a unity, as it is expected to have a higher value than a piecemeal liquidation of its composing parts.

An entrepreneur or a company must not be confused with its establishment. A company can have more than one establishment. The company's establishment(s) will be part of the company's assets, each one with a different value that results from the productive organization it represents. In this sense, the selling of a company (its shares) should not be mistaken with the selling of an establishment – these are two different transactions. There are specific rules in the Brazilian Civil Code devoted to the selling of an establishment – Section 1.142 *et seq.*

In view of these considerations, the oil drilling rigs *Pantanal* and *Amazonia* – as well as any other rigs - can be viewed as an organized complex of assets dedicated for the exercise of an enterprise, since the going concern value of the rigs does not correspond to the mere sum of the individual assets' value. The "goodwill" of the *Amazonia* and *Pantanal* are undeniable, as they generate economic value for an organization, mainly considering the pre-existing contracts, the technology that they comprise, and so on. Proof of the oil drilling rigs' ongoing value is that immediately after the sale-leaseback transaction, Bambu Serviços de Pretróleo e Gás Ltda., the new venture responsible for the enterprise, was able to promptly resume the oil rigs' operation [*See* Am. Compl. ¶88 and 95//97]. Therefore, *Pantanal* and *Amazonia* are establishments under Brazilian Law.

Brazilian case law has already recognized oil drilling rigs as establishments, pursuant to Section 1.142 of the Brazilian Civil Code, in, at least, two other instances. In these cases, the plaintiffs were employees from oil drilling companies and demanded in court a certain labor benefit that depended upon the drilling rigs being considered mere work instruments, and not proper establishments under Brazilian Law. In both cases, Brazilian courts decided that an oil drilling rig should be understood as an establishment under the terms of Brazilian Law, and, therefore, the workers were not entitled to the desired benefit.

7

In the first case, the Court recognized that "*the oil drilling rig in which the plaintiff used to work ceased to operate*" and, since it was an autonomous unit dedicated for the operation of the enterprise, "*this situation is equivalent to an establishment termination*" [Superior Federal Labor Court – Special Labor Appeal n. 68600-16.2012.5.21.0011]. In the second case, in which 2 of Schahin Group's companies[3] were a respondent, the Court stated that it is "*perfectly possible to classify an oil drilling rig as an establishment*" [e.g. State Labor Court, TRT-1st Region – Labor Appeal n. 0101223-89.2019.5.01.0482]. There is a number of other cases where the same conclusion was reached.[4]

## ii. Before selling the *Amazonia* and *Pantanal*, the Schahin Group was required to pay its creditors or obtain their consent

Pursuant to Section 1.145 of the Brazilian Civil Code, if the seller of an establishment does not have sufficient assets to pay its creditors, then the effectiveness of the transaction will depend on [i] the prior payment of all its creditors; or [ii] the consent (whether express or not) of all its creditors, upon notice granting them a period of thirty (30) days to oppose the transaction.

Here, Plaintiff has alleged that the sale-leaseback transaction of the *Pantanal* and *Amazonia* financially drained the Schahin Group and the Group's remaining assets were not sufficient to pay the Schahin Group's creditors.[5]

In fact, at the time the Schahin Group entered the sale-leaseback agreement (in September 2014), it owned just five rigs (*Pantanal* and *Amazonia,* plus *Lancer, Sertão* and *Cerrado*) and was operating another one (*Vitória 10,000,* leased from Petrobras). Based solely on that, it is already clear that the sale of the *Pantanal* and *Amazonia* certainly impacted the Schahin Group's capacity to pay its creditors and could diminish its cashflow in case of default.

---

[3] In the abovementioned case "Base Engenharia e Serviços de Petróleo e Gas S.A." and "Base Petróleo e Gás S.A." were respondents and the controversy involved the oil rig named after "Vitoria 10.000", that ceased to operate in June 2017.

[4] E.g: [i] State Labor Court, TRT-1st Region – Labor Appeal n. 00105976020155010483; [ii] State Labor Court, TRT-1st Region – Labor Appeal n. 00056916720145010481; and [iii] State Labor Court, TRT-1st Region – Labor Appeal n. 01015685720165010483.

[5] "*While Schahin struggled, Defendants engineered a complex sale-leaseback transaction in which the Schahin Group sold both of the drilling rigs to a Chinese bank. See id. 14. The sale proceeds were then given to Defendants as repayment for their loans. See id. Defendants thus unjustly enriched themselves at other creditors' expense, liquidating the company's key assets - the Amazonia and the Pantanal - taking the proceeds, and leaving the other creditors holding debt of a crippled company that had no prospect of repaying it.*" (Amended complaint, p.2-3)

That is the main consequence of the transaction: the Schahin Group disposed of relevant assets and was obliged, on the other hand, to lease the same assets back to maintain its activities. In case of default, the Schahin Group would lose the possession of the rigs and the operation would cease. In this sense it is incorrect to assume the neutrality of the transaction to the Group's finances, as does Mr. Seijo in his declaration ¶¶ 31-33.

Additionally, the Schahin Group's fragile financial condition was also broadly known (especially by Respondents) due to other public facts, *e.g.*, the *Amazonia* and *Pantanal's* Singaporean shipbuilder sued the Schahin Group for its failure to repay loans [*See* Am. Compl. ¶¶ 62-64]; and the downgrade of Schahin Group's ratings by Fitch Ratings and Standard & Poor's in early 2014 [*See* Am. Compl. ¶ 66]. It was plainly foreseeable that the operation would have a relevant negative impact to Schahin Group and on its creditors' rights.

Therefore, pursuant to Brazilian Law, the Schahin Group was required to pay its creditors or provide sufficient notice to creditors to obtain their consent before selling the *Amazonia* and *Pantanal*.

### iii. The Schahin Group's violation of the establishment rule was not actionable until the Schahin Group entered bankruptcy in 2018

Upon the bankruptcy order[6], Bankruptcy Code (Section 129, VI) establishes the ineffectiveness[7] of any sale or transfer of any company's establishment upon fulfillment of two legal requirements: [i] the insufficiency of the debtor's remaining assets to pay its creditors; and [ii] the absence of all the creditors' consent (whether express or not) within thirty (30) days after the notification of the transaction. The rule seeks to allow the bankruptcy estate to recover the assets that should be liquidated to pay all the estate's creditors and, therefore, the establishment rule, as stated in the Bankruptcy Code, can apply only after the debtor's bankruptcy.

Creditors will pursue remedies for an establishment sale only after the seller becomes insolvent. This is consistent with the fact that there is no statute of limitations for the filing of a claim based upon the ineffectiveness of an establishment sale under Section 129, VI of the Bankruptcy Code.

The insolvency of a company is the only reason why its creditors may need to claw back sold assets such as establishments. Therefore, the Schahin Group's creditors had no ability to seek judicial relief related to the rigs'

---

[6] See item 4.b.i below.

[7] *I.e.*, the estate will be able to claw back the assets.

sale prior to the March 2018 liquidation decree that formalized the debtors' insolvency. [*See* Am. Compl. ¶ 98.]

The Schahin Group filed for reorganization in May 2015. [*See* Am. Compl. ¶ 94]. Although the Schahin Group had disclosed the sale of the rigs, the creditor's right to enforce their credits was stayed at that point.[8] No creditor could take any measure to enforce credits during judicial reorganization proceeding pursuant to sec. 6th, of Bankruptcy Code. This means that the right given to creditors by Section 1.145 of the Brazilian Civil Code was not enforceable during the Schahin Group's reorganization.

Mr. Seijo wrongfully states that a claim brought under Brazilian Civil Code Section 1.145 is substantially the same as a claim under Section 129, VI, of the Bankruptcy Code. This would lead to the conclusion that creditors could file a suit on the grounds of Brazilian Civil Code Section 1.145 even before the Schahin's Group bankruptcy, when the sale lease back operation took place [September, 2014]. That is not true.

As is broadly known, Schahin Group went under a reorganization proceeding and during that time the Brazilian Civil Code Section 1.145 was not enforceable due to the stay period [Section 6, II, of the Bankruptcy Code]. Additionally, BCC Section 1.145 differs fundamentally from Section 129, VI, of the Bankruptcy Code, mainly because the second one is a special remedy given to creditors of a bankruptcy estate. Contrary to what is said by Mr. Seijo (¶¶ 22-23), the existence of the Brazilian Civil Code Section 1.145 cannot be used as a means of preventing the Schahin Group's creditors right to claw back assets under Section 129, VI, of the Bankruptcy Code, which became possible only after the bankruptcy order.

In the same way, Mr. Seijo was wrong when he affirmed that the Bankruptcy Code imposes statutes of limitations (he refers to "suspect period"[9]) to the enforcement of rights provided under Section 129, VI. It is not relevant whether the sale of the establishment happened during the

---

[8] "*Section 6. When a debtor is adjudged liquidation or the judicial reorganization process is approved, the progress of all actions and claims against the debtor, (...), are stayed.*"

[9] The 2 years term called "suspect period" is only referred to in Section 129, IV and V of the Bankruptcy Code and does not apply to the Section 129 VI rule:

"*Section. 129. [The following] are ineffective towards the bankrupt estate, whether or not the contracting party was aware of the debtor's state of economic and financial crisis, whether or not it was its intent to defraud creditors:*

*(...)*

*IV. Any free transaction performed up to two (2) years before the bankruptcy order;*

*V. Any waiver to heritage or legacy performed up to two (2) years before the bankruptcy order;*

*VI - the sale or transfer of an establishment made without the express consent or payment of all existing creditors, when the debtor did not remain with sufficient assets to settle his liabilities, unless, within a period of 30 (thirty) days, there is no opposition from creditors, after being duly notified, in court or by the officer of the registry of titles and deeds*".

"suspect period" or not – which is confirmed by some of the authors quoted by Mr. Seijo in this regard, ¶27[10]. The 90 days limitation referred to by Mr. Seijo in ¶27 – that is not "suspect period, but "legal term" ("termo legal") is also not applicable to Section 129, VI because is defined for the cases stated in Section 129, I, II and III[11]. The STJ has ruled the lack of statutes of limitation to Section 129, VI cases:

" (…) the Bankruptcy Laws also considers as ineffective the acts listed in its article 129, IV and V, that took place within the period of 2 (two) years before the bankruptcy decree, in addition to the sale or transfer of the establishment made without the express consent or payment of creditors (item VI), **in which case there is no time limitation**. (…) Furthermore, the declaration of ineffectiveness of the transfer of the establishment business does not depend on whether it took place within the legal term or period of 2 (two) years prior to the breach (art. 129, VI, of Law No. 11,101/2005)."[12]

## b.   Judicial administrator's authority

### i.   The judicial administrator of a Brazilian debtor does not stand in the shoes of the debtor; the administrator acts in the interest of the bankrupt company's creditors and is an assistant to the bankruptcy court

There are two insolvency procedures in Brazil: Liquidation (similar to a Chapter 7 procedure) and reorganization (similar to a Chapter 11 procedure). Although the Bankruptcy Code also provides for a kind of "prepacked bankruptcy" ("Recuperação Extrajudicial"), in most cases the debtor will choose the "Recuperação Judicial", a complex reorganization judicial procedure. "Recuperação Judicial" provides a more complete toolbox for the debtor. That is the reason why Schahin Group filed for

---

[10] SACRAMONE, Marcelo Barbosa. Comentários à Lei de Recuperação de Empresas e Falência. 2 ed., São Paulo: Saraiva, 2021, p. 553-554.

[11] "*Section 129. (…)*
*I. The advanced payment of undue debts by the debtor **within the legal term** (…);*
*II. The payment of due and payable debts held **within the legal term**, in any way other than that provided for by the agreement;*
*III. The register of security right in rem, including the retention **within the legal term** in the case of previously contracted debt (…)*
*…*
*Section 99. The court decision ruling the debtor's bankruptcy shall, including additional determinations:*
*(…)*
*II. **define the legal term of bankruptcy**, which cannot be dated back for more than ninety (90) days from bankruptcy filing, the bankruptcy request or first official statement of default (…);"*

[12] STJ – Resp n. 1890290 - RS (2020/0209030-7) , 3ª Turma, Min. Villas Boas Cueva (02/22/2022).

11

"Recuperação Judicial". Unless mentioned otherwise, "reorganization" in this document will always refer to "Recuperação Judicial".

In Brazilian Law, the "Trustee" is called "Administrador Judicial" or "AJ", which means "judicial administrator." The Judge shall appoint an AJ in every case of reorganization or liquidation under Bankruptcy Code [Section 22, I]. In reorganization, the AJ will be appointed with a supervisory duty: to supervise the debtors' activities, check legal and financial information given by the debtor, and work as an assistant to the judge during the procedure itself. During a liquidation he or she will be appointed by the Judge as well but will assume a more executive role: he or she will collect the assets to constitute the bankruptcy estate, liquidate them, analyze the creditors' claims, and distribute the proceeds to the creditor in a pro rata basis.

He or she has no legal duties related to the bankrupt company nor its shareholders and officers. He or she acts solely in the interest of the bankruptcy estate and its creditors [e.g., Section 22, III, I and L of the Bankruptcy Code]. The Trustee does not "*stand in the shoes of the debtor*" in liquidation.

This conclusion is consistent with the fact that, under the Bankruptcy Code rules, the bankruptcy estate shall not be confused with the debtor (i.e., the bankrupt company). A company is a legal entity which comprises a sum of assets that are geared towards an economic activity. None of those characteristics is shared with the bankruptcy estate.[13]

Pursuant to Section 103 of the Bankruptcy Code, once the liquidation is decreed, the bankrupt company's activities cease, and the debtor forfeits the rights both to manage its assets and to dispose of them. Section 108 of the Bankruptcy Code provides that those assets shall be collected by the Trustee to form the bankruptcy estate. The estate does not have a legal personality, being merely a pool of the liquidating company's assets. These assets will be sold by the nominated Trustee to pay the company's creditors.

The Trustee is appointed by the bankruptcy court to act as its assistant ("*longa manus*"), carrying on a public "*munus*"[14] (a public function) to

---

[13] E.g.: "The Bankruptcy Estate is an institution created by law to exercise the bankrupt company's rights and also to act against it" [*i.e., its partners and agents*]. DINIZ, Maria Helena. Curso de Direito Civil Brasileiro. Vol. I, 24 ed., São Paulo: Saraiva, 2007, p. 294; in the same sense: GONÇALVES, Carlos Roberto. Direito Civil Brasileiro. Vol. I, Parte Geral. 8 ed., São Paulo: Saraiva, 2010, p. 226.

[14] "On the other hand, regarding trustee appointed to act in reorganization or bankruptcy proceedings, its activity is comparable to that of the court's auxiliary bodies, and it fulfills a true public duty. [...] He is effectively responsible for collaborating with the administration of Justice, whether in reorganization or bankruptcy proceedings. [...] Sérgio Campinho agrees with the understanding that the administrator is "an auxiliary organ or agent of justice, created for

administrate and represent the bankruptcy estate exclusively for the interest of its creditors – a very usual structure in insolvency regimes of Civil Law. The Trustee acts with the sole purpose of maximizing the value of the estate's assets for the payment of its creditors.

Therefore, the Trustee assists the Bankruptcy Court and advocates on behalf of the estate to benefit the creditors. Their interests shall not be confused with those of the debtor or its shareholders, as detailed below.

ii. **The debtor often continues to have its own counsel with different responsibilities from the administrator, and under Brazilian law, the administrator is not charged with prior misconduct by the debtor**

In addition to the aforementioned duties, it is important to highlight two others that are especially relevant for this case. Section 22, III, e, of the Bankruptcy Code states that the Trustee must submit (...) "a report on the causes and circumstances that led to the state of bankruptcy, in which **he shall indicate the civil and criminal liability of the parties involved"**; and pursuant to Section 22, III, o, he or she must "take any action necessary for (…) protection of the bankruptcy estate or performance of efficient administration."

To this end, it is broadly accepted by Brazilian courts[15] that the Trustee must file the necessary lawsuits to recover the bankrupt company's assets when he or she realizes that they were unlawfully transferred or diverted. To protect creditors' interests, the Trustee has a legal duty to investigate and prosecute the debtor for any misconduct.[16]

In fact, the bankrupt company remains as a "frozen" legal entity until the end of its liquidation (Sections 206, II, c, and 207 of the Brazilian

---

the public interest public interest and to achieve the purposes of the bankruptcy proceedings" [STJ – Resp n. 1.759.004/RS, 3ª Turma, Min. Nancy Andrighi, 10 de Dezembro de 2019. In this same regard: Resp n. 1.032.960/PR, 3ª Turma, DJe - 06/21/2010].

[15] "In fact, the preliminary allegation of lack of standing of the bankrupt estate to file the liability action against the managing partners is dismissed because, although the bankrupt estate is represented by the trustee and has no legal personality, it has the status of party in the procedural sense, as occurs with the probate estate, so that it has the capacity to be in court (...)." (STJ, AgRg 988.649, Rel. Min Massami Ueda)

[16] In this sense, it is a common practice for the Trustee to investigate the prior misconducts of the bankrupt company's shareholders and officers. See: São Paulo State Court of Justice - TJSP, Agravo de Instrumento nº 2264574-53.2019.8.26.0000, Rel. Des. Araldo Telles, 2ª Câmara Reservada de Direito Empresarial do TJSP, j. em 02.02.2021.

Corporations Act – Federal Law n. 6.404/1976).[17, 18] This is consistent with the fact that the debtor and its shareholders, controllers and officers are still responsible for their previous misconduct – before and after the bankruptcy decree. In liquidation, the bankrupt company's activities are strictly limited to those necessary to preserve its own interests.

The interests of the debtor and its shareholders, controllers and officers often conflict with the bankruptcy estate and creditors' interests.[19] Thus, the liquidating company, its shareholders, controllers and officers often have their own attorneys that represent their interests in the liquidation proceedings.[20] The Trustee does not act on their behalf in any circumstance. Neither can the Trustee, as a mere assistant of the Judge playing a public role (munus), be charged with any prior misconduct of the debtor or its shareholders and officers.[21]

---

[17] "*Section. 206. A Corporation shall be dissolved: (...)  II – by court order: (...) c. upon a bankruptcy liquidation decree according to the applicable law.*
*Art. 207. For liquidation purposes, a dissolved company shall be preserved as a legal entity until its termination.*"

[18] "The mere existence of the Bankruptcy Estate is not a reason to conclude for the automatic, much less necessary, extinction of the legal entity. In fact, the liquidating company is not extinguished or loses its procedural capacity, so much so that it is authorized to act as an assistant in lawsuits in which the Bankruptcy Estate is a party or interested party, including filing for appeals and, during the bankruptcy proceedings, it may even request conservatory measures for the Estate's assets. At the end of the bankruptcy proceedings, when concluded the collection, verification and classification of credits, liquidation of the assets and payment of the Estate's creditors, if any assets remain in the Bankruptcy Estate - or even before, if any of the events set out in article 135 of Law 11.101/2005 occur - the law allows the liquidating firm can request the Court to declare the  extinguishment of all its obligations (article 136), a request that, if granted, authorizes the liquidating firm to resume its activities, "unless it has been convicted or is being prosecuted for a bankruptcy crime" (article 138). Therefore, the judicial award that declares the liquidation of a firm, which gives cause to liquidation of its assets, is the first act of a procedure and does not mean, by itself, the extinction of the company's legal entity. The extinction, preceded by the liquidation of the company's assets, takes place only at the end of the liquidation process, which can, however, be interrupted at any time if the reasons that led to the liquidation cease to exist, as in the case of the granting of a request to declare the liquidating firm's obligations extinguished, pursuant to article 136 of Law 11.101/2005." [Superior Court of Justice - STJ, AgRg no REsp 1265548/SC, Rel. Ministro Antonio Carlos Ferreira, Quarta Turma, julgado em 25/06/2019, Dje 08/05/2019]

[19] "The Bankruptcy Estate is not to be confused with the bankrupt debtor, that is, the debtor against whom a judgment of corporate bankruptcy was issued. In this sense, the appointment of the trustee aims at preserving, above all, the collective interests of the creditors (i.e.: "subjective bankruptcy estate"), not the interests of the liquidating firm, which, more often than not, conflict with the interests of the Bankruptcy Estate. Thus, after bankruptcy has been decreed, the bankrupt debtor does not become a mere spectator in the bankruptcy proceedings and may perform procedural acts in defense of its own interests." [STJ - Resp no 702.835 - PR, Rel. Min. Luis Felipe Salomão].

[20] "On the other hand, the liquidating firm's intervention in the liquidation proceeding is by simple assistance, but as a sui generis litigation assistant, since, in the event of conflict with the interests of the Bankruptcy's Estate, it is certain that it cannot be deprived of defending its assets and rights before the Court." [STJ - AgInt no REsp 1915225/SP, Rel. Ministro Antonio Carlos Ferreira].

[21] "(…) the "administrador judicial" – does not play a private role. His/her activities have the legal nature of an auxiliary body of the Court, playing a public 'munus'(*)". (STJ - REsp: 1032960 PR 2008/0036352-7, Rel. Min. Massami Uyeda) (*) role

14

In summary, the Trustee does not succeed the company or its former directors in bankruptcy in any circumstance.

### c. Scope of Brazilian bankruptcy

#### i. Assets belonging to Sea Biscuit, Black Gold, Baerfield, and Soratu could be made available to satisfy the debts of the bankrupt Schahin Group debtors even though Sea Biscuit, Black Gold, Soratu, and Baerfield are not named debtors in the Brazilian bankruptcy

The assets of Sea Biscuit International Inc., Black Gold Drilling LLC, Baerfield Drilling LLC and Soratu Drilling LLC, as offshore vehicles of the Schahin Group, could be made available to pay the Schahin Group's estate's creditors, even though these companies were not "named debtors" in the Schahin Group's liquidation. The Bankruptcy Code provides for specific mechanisms that allow the Trustee to collect and liquidate assets of other non-bankrupt companies or individuals to satisfy the bankruptcy's creditors, under the conditions described below.

The Schahin's Group reorganization was converted into liquidation because of the debtors' failure to comply with the obligations set forth in the reorganization plan. As a direct consequence, the effects of liquidation only fell over the companies which had previously filed for reorganization [the 'named debtors']. Thus, these companies (not the offshore vehicles) were declared bankrupt (liquidated), and their assets and goods were immediately collected by the Trustee, according to Section 108 of the Bankruptcy Code.

However, in the circumstances referred to in item 4.a.iii, the Bankruptcy Code allows either creditors or the Trustee (acting in creditors' interests) to file a motion to collect assets and goods belonging to other companies or individuals. Under these circumstances, assets owned by Sea Biscuit International Inc., Black Gold Drilling LLC, Baerfield Drilling LLC and Soratu Drilling LLC could be made available to pay Schahin Group's creditors. It is worth noting that a similar situation has already happened in Schahin Group's liquidation. In 2018, the Court added Companhia MS and Schahin Petróleo e Gás S/A [n/k/a/ Base Petróleo e Gás S/A] to the bankruptcy proceedings. *See* Am. Compl. ¶ 98.

#### ii. Creditors could use two principal tools to bring the assets of Sea Biscuit, Black Gold, Baerfield, and Soratu into the liquidation: extension of the liquidation and piercing the corporate veil

Only upon the date of the Schahin Group's bankruptcy order, in March 2018, creditors and the Trustee could file for either a bankruptcy extension or pierce the corporate veil to bring the assets of the Schahin Group's foreign subsidiaries into the bankruptcy.

15

The piercing of the corporate veil is a legal mechanism provided for in Section 50 of the Brazilian Civil Code which allows the judge to extend the effects of certain obligations incurred by a company or individual to other companies or individuals when there is evidence of [i] misusing the legal entity or [ii] commingling of assets. The use of the legal entity with the purpose of damaging creditors [Art. 50, §1º, Brazilian Civil Code] or the violation of patrimonial autonomy [Section 50, §2, Brazilian Civil Code] are both typical situations that lead to the piercing of the corporate veil under Brazilian Law.

In view of the piercing of the corporate veil doctrine, it would be possible to allocate certain assets and property of the non-bankrupt companies – in this case Sea Biscuit, Black Gold, Baerfield and Soratu – to pay the debts and obligations of the bankrupt companies of the Schahin Group in liquidation proceedings [v.g., Superior Court of Justice - REsp (Special Appeal) 881330; REsp (Special Appeal) 1943831/SP].

Another way of achieving a similar goal is the bankruptcy extension, which has broader effects. In summary, this mechanism is a result of case law development and may be used when the bankrupt company colludes with third parties to achieve certain goals prevented by law, as a means to avoid the unwanted effects of bankruptcy. This collusion often comprises the use of legal personality for fraudulent purposes and the use of third parties to hide or divert the debtor's assets to other companies not involved in the bankruptcy proceedings [e.g., Superior Court of Justice – Resp (Special Appeal) n. 63652/SP, Appeal on Injunction n. 12872/SP and Special Appeal n. 1258751/SP]. In such cases, the third party's bankruptcy may be decreed, and its assets and debts are inventoried and treated as part of the liquidation.

The bankruptcy extension implicates in all assets, the ones directly owned by the originally bankrupt company as well as the ones owned by the third-party to which the bankruptcy was extended, being liquidated, and used to pay the estate's creditors. In view of the facts described in the Amended Complaint, if the judge decrees the Schahin Group's bankruptcy extension to Sea Biscuit, Black Gold, Baerfield and Soratu, this would be the fate of these companies' assets, and the companies should be considered bankrupt to the same extent as the others from Schahin Group.

Under either option, the holding company under liquidation would have the opportunity to challenge the creditors or trustee's motion.

The Bankruptcy Code has been recently amended by Law n. 14.112/2020, which provided only for the disregard of legal entity ['piercing of corporate veil'] as a tool to bring assets of third parties to the liquidation deed, excluding the extension of the bankruptcy [Section 82-A of the Bankruptcy Code]. Contrary to Mr. Seijo's claims (¶ 11 n.5), however, the 82-A rule

only applies to a debtor adjudged bankruptcy/liquidation as from January 2021, according to section 5, §1º, III, of Law n. 14.112/2020[22]. For this reason, the extension of liquidation is still available in the Schahin Group's case.

### iii. Extension and piercing the corporate veil would both be appropriate here

Considering the rules applicable in this case, both mechanisms would be appropriate and could be adopted to bring the assets of the offshore companies into Schahin Group's bankruptcy. Plaintiff has alleged that Schahin Group has never denied owning the oil rigs, even if they were directly owned by offshore vehicles Sea Biscuit, Black Gold, Baerfield and Soratu, which were ultimately owned by the Schahin Brothers, who were also controlling partners of the bankrupt companies of the Schahin Group [*See* Am. Compl. ¶¶ 35/39].

By that means, the rigs were part of the Schahin Group's assets. Likewise, Schahin Engenharia identified Baerfield and Soratu as related parties in its financial statements and acknowledged that those entities were managed as part of a single integrated economic conglomerate [*See* Am. Compl. ¶¶ 42/43]. So, there would be no controversy on the indirect ownership of the assets (the rigs), and they could be made available to the creditors in bankruptcy. There is information indicating that the offshore companies would have been used to dispose assets that should have been made available to satisfy the debts of the bankrupt Schahin Group debtors. For example, it seemed to be Schahin's common practice to allocate the rigs' operating expenses to its Brazilian entities (along with all the other group debts) while their revenues were allocated to the non-Brazilian ones, with no or few creditors [*see* Am. Compl. ¶ 41].

All these facts seem to indicate that the Schahin Group's actions authorize the piercing of corporate veil pursuant to Brazilian Law. Brazilian Civil Code Section 50, §1º, states, as previously referred, that the piercing of corporate veil must take place whenever the limited liability of the companies is used "*as a means to harm the companies' creditors or perpetrate any kind of unlawful acts*". That is the case with the Schahin Group, since [i] the rigs were located under parent companies of the bankrupt ones in other to protect these assets from the Group's creditors

---

[22] "*Law 14.112/2020 - Section 5th – Met the applicable provisions of Brazilian Civil procedure Code, this statute will immediately apply to ongoing procedures.*
*§1st – __the following rules will only apply to bankruptcy/liquidation adjudgments and to judicial or extrajudicial reorganizations respectively occurred or filed after this Law come into force__:*
*(...)*
*III – __the rules set for in the caput (head) of the Section 82-A of Law__ 11.101/2005.*"

[Am. Compl. ¶¶104/105]; and [ii] they were sold for less than they were worth, to satisfy the interests of a few strategic creditors as well as of two insiders of the Schahin Group [Am. Compl. ¶69].

In this sense, contrary to what is said by Defendants' expert [¶15], Plaintiff has always referred to the intent of the Schahin Group in harming its creditors and, therefore, met one of the Brazilian Civil Code's justifications for piercing the legal veil. This is consistent with the conclusion, also reached by Mr. Seijo [¶14], that the Brazilian Civil Code establishes two mutually non-exclusive paths that can achieve the same goal.

In any case, the facts also suggest that the Schahin Group acted in disrespect of its companies' patrimonial segregation by abusing of the corporate group structure and its limited liability [¶15]. The alleged fact that one of the Schahin Group's companies provided services and transferred money to other parent companies without the due compensation confirms the lack of patrimonial segregation. The Brazilian Law, on this matter, contrary to Mr. Seijo's opinion [¶15], does not require the conduct to be "repetitive" pursuant to BCC Section 50, §2º, II and III.

Under these conditions and considering the legal requirements for both the disregard of legal entity and the extension of bankruptcy, as mentioned above, it is possible to assume that both mechanisms would be appropriate in this case. Neither the piercing of the corporate veil nor the bankruptcy extension is subject to statutes of limitations.

### iv. The assets of Sea Biscuit, Black Gold, Soratu, and Baerfield could be used to satisfy the Schahin Group's creditors even if Defendants had secured interests in the *Amazonia* and *Pantanal*

The fact that Defendants had secured interests in the Amazonia and *Pantanal* does not mean that the rigs are protected from the Schahin Group's other creditors. This is true due to the peculiar treatment of secured creditors in Brazilian insolvency proceedings (both liquidation and reorganization). Unlike other traditional collateral models, which simply entitle secured creditors a preference over non-secured creditors, the Brazilian Bankruptcy Code provides for several classes of creditors in liquidation proceedings, including "super preferred creditors," many of which are ranked prior to the secured creditors. This explains why, during insolvency, creditors guaranteed by mortgages and liens do not have any specific rights on the assets, which are collected among other assets of the debtor. In a liquidation, those assets can be sold, and the secured creditors will receive only their credit – up to the value of the collateral – if other

creditors with higher priority in the order of claims are previously paid.[23] Therefore, liens and mortgages, for liquidation purposes, do not grant secured creditors guaranteed rights on the assets given as collateral nor on their proceeds.

   v.   **Brazilian bankruptcy law provides for several classes of creditors, some of which take priority over secured creditors in receiving payment from the estate**

As mentioned above, the Bankruptcy Code provides for several classes of creditors. In liquidation proceedings, there are 10 classes of super preferred creditors – (sections 84 and 86) and 7 classes of ordinary creditors (sections 83). Considering all creditors, mortgages and liens' collateralized credits are classified in 12th place (Section 83, II), which means that 11 other classes of super preferred creditors and ordinary creditors have priority over "secured creditors" (liens and mortgages).[24] For example, in liquidation proceedings, a creditor guaranteed by lien or mortgage will be ranked and shall only receive payment after labor credits and work-related injuries credits[25], ACC (Financing by Advancing on an Export Exchange

---

[23] Marcelo Barbosa Sacramone, Former Judge of the 2nd Circuit Court for Bankruptcy and Judicial Reorganizations of the District of São Paulo, states that "*it should be noted that, in contrast to what is stated in Section 1.419 of the Brazilian Civil Code, the product of the asset's liquidation is not linked to the priority satisfaction of the referred credit guaranteed by this asset. **In bankruptcy proceedings, there is no linking between the product of the liquidation and the guaranteed asset**. The liquidation's value is indispensable only to the measurement of the real extent of the credit as belonging to the class of creditors with security in rem. The product will be used to pay the creditors according to the payment order defined by the Law*.". [*in* SACRAMONE, Marcelo Barbosa. Comentários à lei de recuperação de empresas e falência – São Paulo: Saraiva Educação, 2018, p. 331]. In this same vein, there are numerous decisions rendered by the Superior Court of Justice stating the priority held by other creditors over secured creditors, e.g., Binding Precedent n. 307 ["The refund of an advance on a foreign exchange contract, in bankruptcy, must be met before any claim"] and Special Appeal n. 1143950/MG, ratifying the absolute priority of labor credits, labor related credits and post-petition credits.

[24] The order of claims in bankruptcy has also been changed with the recent enactment of Law n. 14.112/2020, but these changes only apply to bankruptcies decreed after January 2021. In any case, even in those recent bankruptcies, secured creditors continue to receive after other preferential creditors, including, *v.g*., labor creditors and retained taxes.

[25] Labor credits and labor accident credits comprise all claims arising from employment contracts, as well as those arising from the Brazilian labor legislation – Decree No. 5.452/1943.

Contract)[26], retained taxes[27] and super preferred credits (i.e., post-petition credits)[28] are paid.



This means that in a liquidation proceeding a creditor guaranteed by lien or mortgage will be ranked and shall only be paid after [1st] labor credits of strictly salary nature up to five times the minimum wages [Section 151]; [2nd] expenses incurred in the bankruptcy's estate management [Section 150]; [3rd, 4th, 5th] restitution in cash of: third-party assets loaned to the debtor that no longer exists by the time of the restitution request or amounts lent under ACC contracts (Financing by Advancing on an Export Exchange

---

[26] ACC is a contract that comprises an anticipation of resources in national currency (BRL) to an exporter, on account of an export to be carried out in the future. Credits arising from this type of contract must be paid with higher priority [Section 86, II, of the Bankruptcy Code].

[27] Taxes that the company, while still in activity, was obliged to retain in its cash and pass on to the treasury, but never did [Section 86, IV, of the Bankruptcy Code].

[28] Credits due from the Bankrupt State that arose after the bankruptcy decree and, therefore, are not to be mistaken with those claims against the bankrupt company while was still in activity. Those post-petition credits comprise all the expenses with schedules, management, asset realization and distribution of the proceeds, as well as court costs of the bankruptcy proceedings [Section 84, III, of the Bankruptcy Code], etc.

Contract)[29] [Section 86, I, II, III]; [6th, 7th, 8th, 9th, 10th] "super preferred credits" – post-petition credits[30] [Section 84, I, II, III, IV, V]; and [11th] labor claims and work-related injuries credits, up to 150 minimum wages[31] [Section 83, I]; and [12th] secured credits [Section 83, II].

### vi. Creditors that exist in the Schahin bankruptcy with priority over secured creditors include individual employees

Section 84 of the Bankruptcy Code, which refers to super preferred credits, guarantees priority to post-petition claims. The same is true of some specific labor credits (Section 151) and liquidation expenses (section 150). These credits shall be paid preferentially.[32] Section 83 of the Bankruptcy Code, which refers to ordinary creditors, also prioritizes labor-related claims, in this case those that arose from services rendered before the decree of bankruptcy [capped at one hundred and fifty (150) minimum wages per creditor] and claims deriving from labor accident with priority over secured creditors[33].

According to the most recent ranking of Schahin Group's creditors,[34] I noted that there is a substantial number of creditors with a higher priority than secured creditors, which have not been paid in the bankruptcy proceeding hitherto. These credits comprise labor credits and other relevant amounts reserved to guarantee unliquidated labor claims held by the Schahin Group's former employees, as well as other post-petition credits, all of whom must be paid prior to secured creditors.

---

[29] ACC is a contract that comprises an anticipation of resources in national currency (BRL) to an exporter, on account of an export to be carried out in the future. Credits arising from this type of contract must be paid with higher priority [Section 86, II, of the Bankruptcy Code].

[30] Credits due from the Bankrupt State that arose after the bankruptcy decree and, therefore, are not to be mistaken with those claims against the bankrupt company while was still in activity. Those post-petition credits comprise all the expenses with AJ's fees, amounts lent to the estate by creditors, schedules, management, asset realization and distribution of the proceeds, as well as court costs of the bankruptcy proceedings, general obligations incurred during judicial reorganization, etc. See note 26.

[31] Labor credits and labor accident credits comprise all claims arising from employment contracts, as well as those arising from the Brazilian labor legislation – Decree No. 5.452/1943.

[32] "*Section 84. Claims relating to the following shall be considered post-petition claims and shall preempt those mentioned in article 83 hereof, in the order set forth below: I. the compensation payable to the trustee and his assistants, and labor-related claims or occupational accident claims referring to services rendered after the decree of bankruptcy; [...]*"

[33] "*Section 83. Claims in bankruptcy shall be rated in the following order: I. labor-related claims, capped at one hundred and fifty (150) minimum wages per creditor, and claims deriving from occupational accidents;* [...]"

[34] Available at: < https://ajruiz.com.br/qgc-provisorio-aj-ruiz-15-outubro-2021/ >

5. CV

5.1     I attach as Exhibit "A" to my Declaration a copy of my curriculum vitae. I confirm that its contents are true and accurate.

6. Materials considered

6.1     I confirm that, as a part of my work, I have reviewed and evaluated the following documents regarding this matter:

a)     Complaint filed by Plaintiff before the S.D.N.Y. Court on July 13, 2021 - Case No. 21-cv-6018-PKC;

b)     Amended Complaint filed by Plaintiff before the S.D.N.Y. Court on November 17, 2021 - Case No. 21-cv-6018-PKC;

c)     Case No. 21-cv-6018-PKC Defendants' response to the Amended Complaint filed before the S.D.N.Y. on August 31, 2021;

d)     Case No. 21-cv-6018-PKC Plaintiff's response to the letter submitted Defendants proposing a motion to dismiss the Complaint filed before the S.D.N.Y on September 17, 2021;

e)     [Case No. 21-cv-6020-PKC Defendants' response to the Amended Complaint filed before the S.D.N.Y. on November 03, 2021;

f)     Case No. 21-cv-6020-PKC Plaintiff's response to the letter submitted Defendants proposing a motion to dismiss the Complaint filed before the S.D.N.Y on November 09, 2021.

Executed in São Paulo, Brazil, on June 23, 2022.

_____
Francisco Satiro

**Exhibit "A"**

To the Declaration of Professor Francisco Satiro

A Copy of The Curriculum Vitae of Dr. Francisco Satiro

# FRANCISCO SATIRO

*Business Law Professor – Faculdade de Direito da USP / University of São Paulo - Law School*
*Satiro Advogados*

2346, Angelica Avenue, 7th Floor, 01228-200 – São Paulo – SP- Brazil
francisco@satiro.adv.br   or   f.satiro@usp.br
Phones: +55 11 2894-9112

---

Specialist in Business Law, Capital Markets and Corporate Contracts (including Construction) and Bankruptcy. Francisco Satiro holds a Bachelor`s Degree in Law from the University of São Paulo Law School (São Paulo, 1993). Member of the Brazilian Bar Association (OAB n. 129.791) since 1993. He also obtained a Doctorate Degree in Business Law (2002 - USP – University of São Paulo Law School), on a thesis titled *"Exchange traded stock options – legal substance"*. Post-doctorate at Max Plank Institute Hamburg (2013).

Professor Satiro teaches Business and Bankruptcy Law on a regular basis at the University of São Paulo Law School since 2003, both on undergraduate and graduation programs. Former Professor of Business Law at Fundação Getúlio Vargas Law School - FGV-SP (2007- 2015). Visiting Professor at Universidad Javeriana de Colombia (2010), Instituto Tecnologico Autonomo de Mexico – ITAM (2011), Faculdade de Direito da Universidade do Porto, Portugal (2012), and Centre for Transnational Legal Studies – CTLS Londres, under coordination of Georgetown University – EUA (2009-2010). Academic Mentor at Law Without Wall Program, Miami University – EUA (2013).

Francisco Satiro is a Founding Member of IBR – Instituto Brasileiro de Recuperação de Empresas [Brazilian Institute of Restructuring] (2008) and ABDE – Associação Brasileira de Direito e Economia [Law and Economics Brazilian Association] (2007). He is also a current member of São Paulo Lawyers Institute – IASP (2015), São Paulo Lawyers Association – AASP (1993), IBGC – Instituto Brasileiro de Governança Corporativa [Brazilian Institute of Corporate Governance](2011), Brazilian Institute of Comparative Commercial Law and Tullio Ascarelli Library (1995), Turnaround Management Association – TMA Brazilian Chapter (2007), III – International Insolvency Institute (2019) e INSOL International (2007).

24

Founding partner of Satiro Advogados Associados since 2005. He is also a former associate lawyer at Castro, Barros, Sobral e Gomes Advogados (2001-2005), practice in M&A. and Corporate Law. Previously, he worked as in-house legal counsel at São Paulo Stock Exchange – BOVESPA (1993-1995).

Professor Satiro has been nominated by the Ministry of Economy to propose amendments to the present Brazilian Bankruptcy Law (Law 11.101/2005) – December 2016 - and by the Ministry of Industry and Commerce to propose a new regulation for the crisis of small and medium enterprises. Former effective member of CRSFN – Court of Appeals of Brazilian Financial System (2011-2015). Since 2008, he figures as Brazilian expert for UNCITRAL Cross-border insolvency group V and Small and Medium Enterprises Group IV - UN - New York and Vienna.

Party-appointed arbitrator and chairman of arbitral tribunals in proceedings before ICC, AMCHAM, CAM-CCBC, CAM FGV, CAMARB, CAM B3 and the Chamber of Conciliation, Mediation and Arbitration CIESP/FIESP for the last 12 years.

### Academic Background

- Doctorate in Business Law, 2002 - USP – Sao Paulo University Law School, "Exchange traded stock options – legal substance"
- Graduation in Procedural Law, 1995 – CEU – University Extension Centre - SP.
- Bachelor`s degree in Business Law at USP – Sao Paulo University Law School (1993)

### Professional Experience:

- 2000 - present: expert witness in foreign procedures (lawsuits and arbitrations)
- 2011 – 2015: CRSFN – Court of Appeals of Brazilian Financial System – effective member
- 2008 - present: Brazilian expert for UNCITRAL Cross-border insolvency group V and Small and Medium Enterprises Group IV. UN - New York and Vienna.
- 2012 – 2014: member of INSOL World Editorial Board.
- 2005 - present: Satiro Advogados: Founding Partner
- 2001- 2004: Castro, Barros, Sobral e Gomes Law : Associate Lawyer
- 1993 - 1995: BOVESPA – Sao Paulo Stock Exchange: Legal Department
- 1998-present: appointed trustee in bankruptcy procedures

*Recent Academic Experience*

- 2002 – present: Professor of Business Law - USP – São Paulo University Law School http://www.direito.usp.br/docentes/comercial/dco_docentes_francisco_satiro_01.php
- 2007- 2015: Professor of Business Law – FGV-SP – Fundacao Getulio Vargas Law School – Sao Paulo http://direitogv.fgv.br/professor/francisco-satiro-de-souza-junior
- 2009 – 2010 – Professor of Law – CTLS – Centre for Transnational Legal Studies – London – Discipline: Capital Markets Regulation (fall term – six months class) https://www.law.georgetown.edu/ctls/staff/francisco-satiro/
- 2013 – Academic Mentor – Law Without Walls Miami University – Instituto de Empresas – Segóvia and University of Miami – USA – http://lawwithoutwalls.org/community-draft#s_section
- 2012 - Visiting Professor: Law Schools Global League – LSGL – Faculdade de Direito de Lisboa –

- Portugal – Co teaching Prof. Erik Vermeulen (Tilburg) Discipline: Business Forms in a Transnational Context (8 days class) https://lawschoolsgloballeague.com/wp-content/uploads/2017/01/1st-Summer-School-Lisbon-2013.pdf
- 2011 - Visiting Professor: ITAM – Instituto Tecnológico Autonomo do Mexico – Mexico City – Co-Teaching Francisco Reyes Villazimar – Universidad Los Andes. Discipline: Comparative Company law.
- 2010 – 2013 – Professor: Law Schools Global League – LSGL – FGV-SP – Capital and Financial Markets Regulation in Brazil (15 weeks course)
- 2011 – Visiting Professor: Pontificia Universidad Javeriana – Bogota and Cali. Capital Markets Regulation
- 2002-2013 – Lecturer and coordinator: GVLaw – São Paulo - Capital Markets – Legal Aspects – (15 weeks post-graduation course) http://direitogv.fgv.br/sites/direitogv.fgv.br/files/arquivos/mercado_de_capitais_201401.pdf

*Institutional*

- 1994 – present: Member of the Brazilian Institute of Comparative Commercial Law and Tullio Ascarelli Library
- 2002 – present: Member the Board of editors of RDM Law Review (Revista de Direito Mercantil, Industrial, Econômico e Financeiro – RDM).
- 2007 – 2015: Coordinator of the Bankruptcy Committee of IBRADEMP (Brazilian Institute of Business Law)
- 2009 – present: Founder member of IBR – Brazilian Institute of stressed companies restructuring

26

- 2007 – present: Member of TMA – Turnaround Management Association

- 2007 – present: Research Project Reviewer at the São Paulo Research Foundation - FAPESP

- 2012 – present: Member of ECGI – European Corporate Governance Institute

### Recent Books and Articles

- CORDEIRO, A. B. M. (Org.) ; SATIRO, F. (Org.) . Direito dos Valores Mobiliários e dos Mercados de Capitais - Angola, Brasil e Portugal. 1. ed. Lisboa: Almedina, 2019. v. 1. 663p .

- SATIRO, F.. Mercado de Capitais. 1. ed. São Paulo: Saraiva, 2013. v. 1. 304p .

- SATIRO, F.. Direito, Gestão e Prática: Mercado de Capitais - Série GvLaw. 1. ed. São Paulo: Saraiva, 2013. v. 1. 304p .

- SATIRO, F.; TOLEDO, Paulo Fernando Campos Salles de (Org.) . Direito Das Empresas Em Crise: Problemas e soluções. 1. ed. São Paulo: Quartier Latin, 2012. v. 1. 406p .

- SOUZA JUNIOR, Francisco Satiro de; PITOMBO, Antonio Sérgio A de Moraes (Org.) . Comentários à Lei de Recuperação de Empresas e Falência. 2. ed. São Paulo: Revista dos Tribunais, 2007. v. 1. 667p .

- SATIRO, F.; HAENSEL, T. . Inovação Tecnológica e Regulação do Mercado de Valores Mobiliários. In: A. B. Menezes Cordeiros e Francisco Satiro. (Org.). Direito dos Valores Mobiliários e dos Mercados de Capitais. 1ed.Lisboa: Almedina, 2019, v. 1, p. 467-498.

- SATIRO, F.; DULLIOS, A. C. . Atuação das Instituições de Mercado Financeiro e de capitais na Prevenção à Lavagem de Dinheiro e do Financiamento do Terrorismo - Panorama. In: A. B. Menezes Cordeiro e Francisco Satiro. (Org.). Direito dos Valores Mobiliários e dos Mercados de Capitais. 1ed.Lisboa: Almedina, 2019, v. 1, p. 589-622.

- SATIRO, F.; PITTA, A. G. . A desmutualização das Bolsas de Valores: Eficiência e Conflito de Interesses. In: Astrid Uzcátegui Angulo; Julio Rodriguez Berrisbeitia;. (Org.). Libro Homenaje al Professor Alfredo Morles Hernández - Derecho Financiero y Concursal. 1ed.Caracas: Universidad Católica Andrés Bello; Universidad de Los Andes; Universidad Monteávila; Universidad Cen, 2013, v. III, p. 361-381

- SOUZA JUNIOR, Francisco Satiro de. Dissolução de Sociedades Anônimas. In: FINKELSTEIN, Maria E. R.; PROENÇA, José Marcelo Martins. (Org.). Direito Societário - Gestão e Controle. São Paulo: saraiva, 2008, v. , p. 152-182.

- SOUZA JUNIOR, Francisco Satiro de. Breves notas sobre o estado de liquidação da sociedade. In: CASTRO, Rodrigo R. Monteiro de; ARAGÃO, Leandro Santos de. (Org.). Direito Societário Desafios Atuais. São Paulo - SP: Quartier Latin do Brasil, 2008, v. , p. 441-453.